689 A.2d 747

KIMBER PETROLEUM CORPORATION, A NEW JERSEY CORPORATION AND SUCCESSOR TO KIMBER–ALLEN PETROLEUM CORPORATION, PLAINTIFF–APPELLANT, v. TRAVELERS INDEMNITY COMPANY AND CALIFORNIA UNION INSURANCE COMPANY, NOW CENTURY INDEMNITY COMPANY, SUCCESSOR TO CIGNA SPECIALTY INSURANCE COMPANY, FORMERLY KNOWN AS CALIFORNIA UNION INSURANCE COMPANY, DEFENDANTS–RESPONDENTS, AND THE HARTFORD

INSURANCE GROUP, NATIONAL UNION FIRE INSURANCE OF PITTSBURGH, AMERICAN INTERNATIONAL ADJUSTMENT COMPANY, INC., GREAT AMERICAN SURPLUS LINES INSURANCE COMPANY, INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, NORTHWESTERN NATIONAL INSURANCE COMPANY, AND THE NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, JOHN DOE COMPANIES, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted November 25, 1996—Decided February 26, 1997.

Before Judges PETRELLA, LANDAU and WALLACE.

*Anderson Kill Olick & Oshinsky*, attorneys for appellant (*Michael S. Gordon* on the brief).

*Graham, Curtin & Sheridan*, and *Mary Kay Vyskocil* (*Simpson Thacher & Bartlett*) of the New York Bar, admitted *pro hac vice*, attorneys for respondent Travelers Indemnity Company (*Joseph R. McDonough* and *Ms. Vyskocil* on the brief).

*Reggerio & Leodori* and *Paul Koepff* and *Kathleen L. Beiermeister (O'Melveny & Myers)* of the New York Bar, admitted *pro hac vice*, attorneys for respondent Century Indemnity Company (*Ms. Beiermeister* on the brief).

The opinion of the court was delivered by

WALLACE, J.A.D.

Plaintiff Kimber Petroleum Corporation appeals from the Law Division's grant of summary judgment in favor of defendants Travelers Indemnity Company (Travelers) and California Union Insurance Company, now Century Indemnity Company (Century). On appeal plaintiff essentially contends that: (1) summary judg-

ment was improperly granted because there are genuine issues of material fact which require jury resolution; and (2) discovery should have been permitted because the insurance industry's regulatory history, drafting history and other documents concerning the absolute pollution exclusion clause have been deemed relevant in other New Jersey cases and are particularly relevant here. We affirm.

The facts in this case are undisputed. Plaintiff sells and distributes gasoline from major brand-name refiners to gas stations in New Jersey. Between 1986 and 1990, plaintiff was named a defendant in a variety of third-party actions arising out of environmental damage caused by leaking underground gasoline storage tanks which were either owned, leased or supplied by plaintiff. During this time the New Jersey Department of Environmental Protection (DEP) issued a number of directives under the New Jersey Spill Compensation and Control Act (the Spill Act), *N.J.S.A.* 58:10–23.11 to –23.11z, to plaintiff ordering it to pay the costs to remediate contamination from those leaking underground gasoline storage tanks.

After defendants denied coverage, plaintiff instituted this action in September 1990 against nine insurance companies, including defendants Travelers and Century, seeking a declaratory judgment that defendants were liable under policies issued by them to plaintiff for defense, investigation costs, and indemnification. The complaint also included claims for breach of contract, negligent inspection, violation of the Consumer Protection Act, breach of warranty of uniformity, failure to warn, and breach of implied warranty of fitness. The complaint alleged that plaintiff had been sued by DEP and three other third parties for damages allegedly caused by contamination from underground gasoline storage tanks supplied with gasoline by plaintiff.

Both Travelers, a primary carrier, and Century, an excess carrier, answered the complaint denying most allegations and asserting by way of defense the pollution exclusion clause in their respective policies. On July 29, 1992, both Travelers and Century

moved for summary judgment on the ground that the absolute pollution exclusion clause in their respective policies operated to exclude from coverage the underlying claims lodged against plaintiff. Plaintiff opposed the motions arguing that genuine issues of material fact exist to preclude the entry of summary judgment. Further, plaintiff sought discovery prior to consideration of the motions.

The trial judge found that the absolute pollution exclusion clauses were clear and unambiguous and did not require additional interpretation or definition. Consequently, the judge granted summary judgment in favor of Travelers and Century. The trial judge's opinion was embodied in orders dated October 30, 1992, which were supplemented by orders dated November 25, 1992 and amended by orders dated December 7, 1992. Plaintiff's motion for leave to appeal was denied in both this court and the Supreme Court.

By letter dated August 26, 1993, plaintiff requested that the judge vacate the grant of summary judgment and permit plaintiff to conduct discovery concerning the drafting and regulatory history of the absolute pollution exclusion clause, based upon the Supreme Court's July 21, 1993 decision in *Morton International, Inc. v. General Accident Insurance Co. of America*, 134 *N.J.* 1, 629 *A.*2d 831 (1993), *cert. denied*, 512 *U.S.* 1245, 114 *S.Ct.* 2764, 129 *L.Ed.*2d 878 (1994), and two out-of-state decisions. The trial judge denied plaintiff's request.

In June 1994, plaintiff again sought reconsideration based on a Louisiana Supreme Court case holding that the absolute pollution exclusion clause was ambiguous. On July 1, 1994, the trial judge wrote to counsel declining to reconsider the matter.

While not documented in the record, the parties represent that, between December 21, 1994 and July 1995, plaintiff negotiated settlements with all of the insurance company defendants except Travelers and Century. On July 7, 1995, the trial judge dismissed with prejudice and without costs all claims against Hartford Insurance Group, National Union Fire Insurance Company of

Pittsburgh, Northwestern National Insurance Company, and New Jersey Property–Liability Insurance Guaranty Association.

On July 10, 1995, plaintiff again sought reconsideration of the October 30, 1992 and December 7, 1992 orders based on newly discovered evidence. Travelers opposed plaintiff's motion, asking that it be rejected without further briefing by the parties and that the material submitted by plaintiff in support of its motion be stricken from the record. On July 27, 1995, the trial judge denied plaintiff's motion. On August 21, 1995, plaintiff filed its notice of appeal. We denied both Travelers' motion to dismiss the appeal as untimely filed and plaintiff's motion to supplement the record.

## I

Plaintiff argues that the Supreme Court's reasoning in *Morton International, supra,* 134 *N.J.* 1, 629 *A.*2d 831, should control the disposition of this matter. In *Morton,* the insured sought coverage under policies that provided indemnification for property damage "resulting from an occurrence" except where that property damage arose out of the discharge, dispersal, release or escape of contaminants or pollutants in or upon land. *Id.* at 10–11, 629 *A.*2d 831. That exclusion, however, did not apply if "such discharge, dispersal, release or escape is sudden and accidental." *Id.* at 11, 629 *A.*2d 831. An occurrence was defined as an "unexpected event or happening ... or a continuous or repeated exposure to conditions" resulting in property damage "provided the insured did not intend or anticipate that injury to or destruction of property would result." *Id.* at 10, 629 *A.*2d 831.

In establishing the parameters of the pollution exclusion clause, the Court held that the phrase "sudden and accidental" did not characterize or relate to the damage caused by the pollution, but only to the "discharge, dispersal, release or escape" of pollutants for which coverage was provided. *Id.* at 28, 629 *A.*2d 831. Consequently, the Court held that the phrase "sudden and accidental" described "only those discharges, dispersals, releases, and escapes of pollutants that occur abruptly or unexpectedly and are

unintended." *Id.* at 29, 629 *A.*2d 831. However, the Court went on to note that such an interpretation would "sharply and dramatically" restrict the coverage that had previously been provided under Comprehensive General Liability (CGL) policies for property damage caused by accidental pollution because, under occurrence-based policies, coverage was provided for any type of property damage that was "neither expected nor intended from the standpoint of the insured." *Ibid.* When the standard pollution exclusion clause was presented to state insurance regulatory agencies, the industry maintained that the exclusion would simply clarify existing coverage and that there would be a continuation of coverage for pollution-caused injuries which resulted from an accident. *Ibid.* Thus, the language of the clause did not support that representation. The Court opined:

> Rather than "clarify" the scope of coverage, the clause virtually eliminated pollution-caused property-damage coverage, without any suggestion by the industry that the change in coverage was so sweeping or that rates should be reduced. For those reasons, we decline to enforce the standard pollution-exclusion clause as written. To do so would contravene this State's public policy requiring regulatory approval of standard industry-wide policy forms to assure fairness in rates and in policy content, and would condone the industry's misrepresentation to regulators in New Jersey and other states concerning the effect of the clause.
>
> [*Id.* at 30, 629 *A.*2d 831.]

Here, the interpretive tension is between the absolute pollution exclusion clause and the provisions for completed operations and products hazards coverage. Plaintiff relies on documents and transcribed testimony from insurance industry leaders in contending that the absolute pollution exclusion clause was never intended to be absolute and that exceptions were contemplated for completed operations risks, products hazards, and certain other off-premises emissions. Therefore, plaintiff contends that its underlying liabilities to DEP and third-party property owners fall within the protection of the completed operations and products hazards provisions, putting them outside the scope of the absolute pollution exclusion clause and entitling plaintiff to coverage.

Plaintiff's policy with Travelers defined "completed operations hazards" as including:

[B]odily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earlier of the following times:

(1) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of

(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof.

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in the Company's manual specifies "including competed operations";

. . . .

The policy went on to define "products hazards" as including:

[B]odily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others.

The pollution exclusion endorsement in the policy captioned "Total Exclusion–Waste and Pollutants" provided:

It is agreed that the exclusion relating to the emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant is deleted and replaced by the following:

This insurance does not apply:

(1) to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

(a) at or from any premises the named insureds own, rent or occupy,

(b) at or from any site or location used by or for the named insureds or others for the handling, storage, disposal, processing or treatment of waste,

(c) which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for the named insureds or any person or organization for whom the named insureds may be legally responsible, or

(d) at or from any site or location on which the named insureds or any contractors or subcontractors working directly or indirectly on the named insureds' behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations, or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants;

(2) to any loss, cost or expense arising out of any governmental direction or request that the named insureds test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Century issued one excess liability insurance policy to plaintiff, which was in effect between May 30, 1985 and May 18, 1986. That policy contained a separate endorsement captioned "Absolute Pollution Exclusion Endorsement," which provided:

In consideration of the premium charged, it is hereby agreed and declared that this policy shall not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water.

Century's excess policy has a broad pollution exclusion clause and has no corresponding completed operations and products hazards provisions. By its terms Century's policy does not alter the provisions of Travelers' policy. Thus, if coverage is found under the completed operations provisions of Travelers' policy and plaintiff's liability is determined to be in excess of Travelers' policy's limits, coverage under Century's excess policy would be triggered.

Although the trial judge found plaintiff's industry-intent evidence unpersuasive, we have considered the documents containing insurance industry official comments concerning the absolute pollution exclusion clause. Robert Sullivan, vice president of govern-

ment affairs for Crum & Foster Insurance Company in Morristown, appeared before the Department of Insurance on December 18, 1985. He testified that despite the language of the absolute pollution exclusion clause, insurance companies still provided "significant coverage for completed operations and product liability in certain off-site discharges . . . [and] a considerable amount, admittedly for certain classes of risk, of pollution liability coverage, even under the almost total pollution exclusion that the current forms provide." Sullivan's testimony referred to a form of the absolute pollution exclusion clause drafted by the Insurance Services Office, Inc. (ISO). This organization is a nonprofit corporation that makes ratings, policy forms and related services available to any United States property/casualty insurer. At least one form of that absolute pollution exclusion clause is virtually identical to the clause in Travelers' policy.

In a 1985 "explanatory memorandum" concerning that form of the pollution exclusion endorsement, ISO indicated that "the exclusion does not apply to damages arising out of products or completed operations nor to certain off-premises discharges of pollutants. Clean-up costs are specifically excluded as a clarification of current intent." ISO published a workbook concerning its policy forms and endorsements which made specific reference to pollution liability coverage and the "new pollution exclusion" which it said excluded pollution coverage under most circumstances and specifically excluded cleanup and similar costs. However, it noted that "there is coverage for some off-site emissions, including the Products/Completed Operations exposure." The workbook illustrated that:

> The insured would be covered for bodily injury and property damage liability arising out of the following situations, whether the emission of pollutants is sudden or gradual:
>
> • The insured's chemical products are sold to a manufacturer and escape while being used in the manufacturer's operations.
>
> • The insured installs a tank on someone else's premises (other than a waste disposal or treatment site) and the tank leaks, resulting in the release of pollutants.

• The insured or a subcontractor, while working at a jobsite, ruptures an oil pipe by accidentally ramming it with a bulldozer.

[However], all cleanup costs and related or similar costs incurred at government request or direction are specifically excluded.

ISO justified the need for an absolute pollution exclusion clause because of the "erratic and potentially ruinous [judicial] interpretations" of current pollution coverage provisions. It explained:

Under our new exclusion, coverage is provided in the basic policy for products/ completed operations and some other off-premises exposures. No distinction is made between "sudden" and "gradual" emissions. There will be three ways of obtaining coverage for exposures, both "sudden" and "gradual", that are now excluded: a standard endorsement deleting the pollution exclusion (except that part relating to clean-up costs) from either of the two new CGL policies; and two self-contained pollution liability coverage parts, one with and one without coverage for clean-up costs imposed by governmental agencies.

In a February 6, 1986 letter from the ISO manager of its commercial casualty division to insurance company members of ISO's General Liability Committee, the author attached an ISO response to a question about the scope of the absolute pollution exclusion clause:

Given that recent court interpretations of the "sudden and accidental" pollution exclusion have found a great degree of coverage that was never intended nor contemplated in the rates, the drafters of the new pollution exclusion consciously used broad terms to ensure that coverage intent would be upheld. The new exclusion is designed to exclude all pollution damages except those arising out of products, completed operations and certain other off-premises emissions.

Another ISO document, in question and answer form, provides the most detailed response to a question concerning the scope of and exceptions to the pollution exclusion clause:

The new ISO "pollution" exclusion is intended to be all inclusive and, therefore, does not contain any specific exceptions, per se, such as the "sudden and accidental" exception in the former exclusion which all but totally emasculated the intent of the exclusion. Whether or not some courts will avoid the seemingly clear import of the new wording remains to be seen.

. . . .

On the other hand, there are situations involving a discharge, dispersal, etc. of toxic materials which do not fall within the scope of the exclusion. Examples of this are situations coming within the products hazard since a bodily injury or property damage occurring to a consumer, for instance, is not within the exclusion. A similar example would be the completed operations hazard since the use of the

present tense verbs "working" and "are performing" in subsection (d) of Exclusion f.(1.) suggests that it does not apply to operations that are completed.

. . . .

One word of caution is appropriate here. Note that section (2) of the exclusion (which deals with the "cleanup," etc. aspect) seems unlimited and would defeat coverage for those types of costs, however caused and wheresoever occurring. This is particularly significant since these types of costs and liabilities have, to date, been by far the most expensive aspect of the pollution problem.

On February 28, 1986, the Commissioner of Insurance approved use of an absolute pollution exclusion in commercial liability insurance policy forms. The Commissioner did not endorse any particular form of the absolute pollution exclusion, but required that the clause adopted by the companies conform with certain conditions set out in the agency bulletin.

■ With this background, we are persuaded that *Morton, supra,* 134 *N.J.* 1, 629 *A.*2d 831, does not require that we ignore the pollution exclusion clause here. In *Morton,* the Court found that, prior to the introduction of the standard pollution exclusion clause, CGL policies provided coverage for gradual pollution-related damages. *Id.* at 29, 629 *A.*2d 831. Insurance industry officials assured state regulators that the insertion of the new pollution exclusion would not affect scope of coverage but would simply clarify the coverage provisions in the existing policies. *Id.* at 30, 629 *A.*2d 831. The insertion of that exclusion, however, had the opposite effect; coverage was severely restricted rather than maintained at its prior level. *Ibid.* The Court interpreted the standard pollution exclusion clause so as to hold the industry to its representations to the state regulators and to maintain coverage at the level asserted to exist in the policies. *Ibid.*

The insurers contend that the damages sustained by plaintiff fall solely within the pollution exclusion. This position, however, does not transform this case into a *Morton* situation requiring judicial intervention and special interpretation of the pollution exclusion clause against its plain language. Here, unlike in *Morton,* the insurance industry candidly acknowledged that the absolute pollution exclusion would totally prohibit coverage for pollu-

tion-related damages, allowing only for very narrow exceptions. We find no evidence that the insurance industry misled regulators. Rather, they consistently maintained that the absolute pollution exclusion clause excluded all pollution-related damages except for those falling within the completed operations and products hazards coverage if such coverage was purchased by the insured. The question remains whether the pollution exclusion clause can coexist with completed operations hazards coverage where damages are pollution related. The trial judge did not reach this question because he concluded that the pollution exclusion clause was unambiguous and should be enforced as written.

The parties have not directed us to any New Jersey precedent regarding the relationship between the absolute pollution exclusion clause and the completed operations hazards coverage. Other jurisdictions are divided on this issue. *Compare Gregory v. Tennessee Gas Pipeline Co.,* 948 *F.*2d 203, 208 (5th Cir.1991) (under Louisiana law, pollution exclusion applies to product-completed operation hazard) *and Crescent Oil Co. v. Federated Mut. Ins. Co.,* 20 *Kan.App.*2d 428, 888 *P.*2d 869, 874 (1995) ("[T]he products completed operations clause does not cover hazards excluded by the pollution exclusion.") *with West American Ins. Co. v. Tufco Flooring E., Inc.,* 104 *N.C.App.* 312, 409 *S.E.*2d 692, 695 (1991) ("[Pollution exclusion is] expressly inapplicable to and overridden by the 'completed operations' coverage.").

New Jersey courts have addressed the absolute pollution exclusion clause and the completed operations hazards coverage separately. We have consistently held that the pollution exclusion clause is clear and unambiguous. *A & S Fuel Oil v. Royal Indem. Co.,* 279 *N.J.Super.* 367, 371, 652 *A.*2d 1236 (App.Div.), *certif. denied,* 141 *N.J.* 98, 660 *A.*2d 1196 (1995); *Nunn v. Franklin Mut. Ins. Co.,* 274 *N.J.Super.* 543, 547, 644 *A.*2d 1111 (App.Div.1994); *Vantage Dev. Corp. v. American Env't Techs. Corp.,* 251 *N.J.Super.* 516, 525–26, 598 *A.*2d 948 (Law Div.1991). Further, we made the same observation about the completed operations hazards provision. *See Williams v. Aetna Cas. & Sur.,* 151 *N.J.Super.* 68,

70, 376 *A.*2d 562 (App.Div.1977) (language of policy provision was plain and unambiguous and required no construction to ascertain its meaning).

Generally, words in an insurance policy should be interpreted according to their plain and ordinary meaning. *Voorhees v. Preferred Mutual Ins. Co.,* 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992); *Longobardi v. Chubb Ins. Co.,* 121 *N.J.* 530, 537, 582 *A.*2d 1257 (1990). We should not engage in a strained construction to support the imposition of liability. *Longobardi, supra,* 121 *N.J.* at 537, 582 *A.*2d 1257. While insurance policies should be construed in favor of the insured, we " 'should not write for the insured a better policy of insurance than the one purchased.' " *Ibid.* (quoting *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989)).

In our view, the pollution exclusion clause and the completed operations hazards coverage can coexist within the same policy because the conditions under which they each operate are distinct. In the present case, although titled "Total Exclusion," the pollution exclusion clause in Travelers' policy details very specific instances or situations that will nullify the insurance coverage for bodily injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants." With respect to operations, the pollution exclusion clause speaks in the present tense and refers to an exclusion of insurer liability where the named insured or its contractors or subcontractors "are performing operations" and two other conditions (not relevant here) exist at the same time. This is to be contrasted with the completed operations hazards provision, which provides coverage only in instances where the operations are completed and the bodily injury or property damage occurs away from premises owned by or rented to the named insured.

Thus, if the pollution-causing substance escapes from property owned, rented or occupied by the named insured and causes bodily injury or property damage, the pollution exclusion clause will not permit the named insured to be indemnified for its liability arising

therefrom. However, if the named insured performs an operation, such as gasoline delivery, upon property it does not own or rent, and pollution-related damage arises out of that operation after the operation has been completed, the pollution exclusion clause would not prohibit indemnification unless the damages sought to be recovered constituted "any governmental direction or request that the named insureds test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize the pollutants." Consequently, if the claim against the insured by a third party, not a governmental entity, is for property damage sustained by that third party after the insured completed its operations upon property not owned, rented or occupied by the insured, the insured would be entitled to indemnification.

The underlying claims against plaintiff consist of directives by DEP to pay money damages for remediation or cleanup of the properties contaminated by gasoline supplied by plaintiff, and suits by third-party property owners for damages they sustained as a result of the leaking gasoline. The pollution exclusion clause expressly denies coverage and indemnification for DEP-mandated cleanup costs whenever the damages occurred, that is, pre- or post-completion of the gasoline delivery operation.

With respect to the third-party property damage claims, the analysis is not so simple. If the third-party property owners sustained gasoline-contamination damages which emanated from leaking storage tanks on property plaintiff owned, rented or occupied, the pollution exclusion clause would operate to preclude recovery by plaintiff under the policy. If, however, plaintiff delivered gasoline to storage tanks on property with which it had no connection, and the gasoline leaked out of the storage tank causing damage to the third-party property owners after the delivery operation was completed, then the coverage which plaintiff purchased under the completed operations hazards provision would be triggered, and plaintiff would be entitled to indemnification for those damages.

This, in turn, raises questions about the nature of the underlying claims lodged against plaintiff. The claims can be categorized as follows: (1) not-covered bodily injury or property damage claims caused by pollution emanating from property owned, rented or occupied by plaintiff and/or governmentally directed cleanup costs; or (2) covered claims under the completed operations hazards provision because they are claims for bodily injury or property damage caused by pollution emanating from property not owned, rented or occupied by plaintiff and occurring after plaintiff completed its gasoline delivery operations to those premises.

Plaintiff's complaint refers to five contaminated sites. The first site is located in West Milford, New Jersey. DEP issued directives between 1984 and 1987, requiring plaintiff to pay money damages and to take steps to remediate contamination from underground gasoline storage tanks. This property was used as a gasoline station that was owned by plaintiff's subsidiary and serviced by plaintiff. This pollution-related claim against plaintiff falls within the plain meaning of the pollution exclusion clause because: (1) the gas station consisted of property owned by plaintiff, the insured; and (2) the indemnity sought by plaintiff consists of governmental-agency-imposed cleanup costs. Similarly, the third-party suit arising from that contamination cannot qualify for coverage under plaintiff's completed operations hazards provision because the property from which the pollutant emanated was owned by plaintiff, placing this situation squarely within the scope of the pollution exclusion clause.

The Colonia site was subject to a DEP directive to pay money damages and to take steps to remediate contamination from leaking underground storage tanks at property leased by plaintiff. Plaintiff is not entitled to indemnity for these damages because the pollution exclusion clause expressly applies to property leased by the insured as well as to cleanup costs governmentally mandated.

The West New York site, also the subject of a DEP directive for money damage and remediation, was not owned or operated under

a leasing agreement by plaintiff. Plaintiff's relationship with that property was as a gasoline supplier only. Nevertheless, the pollution exclusion, with its express reference to the insurer's non-liability for governmentally ordered cleanup costs, prohibits indemnification.

Plaintiff was subject to environmental damage claims with respect to two locations in North Brunswick. The first concerned a piece of property identified only as the North Brunswick site. DEP issued a money-damage and remediation directive because of gasoline contamination from leaking underground gasoline storage tanks. While the passing of the property ownership to plaintiff is not clear from the record, the pollution exclusion clause prevents plaintiff from recovering expenses because they fall within DEP-directed cleanup costs. The second location in North Brunswick involved a gas station called "Foreign Car Service." This location was the subject of a DEP money-damage and remediation directive because of leaking gasoline from the underground gasoline storage tanks located there. Although this property was not owned by plaintiff, the pollution exclusion clause prohibits indemnification because these damages are cleanup costs.

The site in Warren is a gas station not presently owned by plaintiff. Plaintiff owned and leased out the station from 1976 to 1978. Thereafter, it sold the property and became its gasoline supplier. A neighboring property owner brought suit in 1989 seeking damages allegedly caused by leaking gasoline from underground storage tanks. However, the underlying claim in that complaint was not for property damage. According to plaintiff, the damages constituted additional engineering fees which the neighboring property owner had to incur in connection with his subdivision approval application because the property had been contaminated by gasoline in the past. What the neighboring property owner sought was reimbursement of his expenses for testing of the property to assure the municipality that there was no ambient hydrocarbon contamination in order to get subdivision approval. Because the completed operations hazards coverage

provides indemnification only for bodily injury or property damage, this claim does not qualify.

In sum, the underlying claims for which plaintiff sought defense and indemnification either fall squarely within the plain language of the pollution exclusion clause or do not fit within the equally clear provisions for completed operations hazards coverage.

## II

■ Finally, plaintiff argues that the trial judge erred in granting summary judgment to defendants without first providing plaintiff with an opportunity to conduct discovery, which would have produced evidence that defendants' interpretation of the absolute pollution exclusion clause was contrary to the representations to state regulators that the exclusion was intended as something less than absolute. The trial judge denied discovery, concluding that the pollution exclusion clause was unambiguous and that there was no need to delve further into the insurance industry's intent when the clause was initially promulgated. We agree that there was no need for additional discovery. Plaintiff's contention to the contrary is without merit. *R.* 2:11–3(e)(1)(E).

Affirmed.