810 A.2d 68 (2002)
355 N.J. Super. 262
CHAMPION DYEING & FINISHING CO., INC., Plaintiff-Appellant,
v.
CENTENNIAL INSURANCE COMPANY and North River Insurance Company, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 2002.
Decided November 19, 2002.
*69 Steven T. Singer argued the cause for appellant.
Robert J. Kelly argued the cause for respondent Centennial Insurance Company (McElroy, Deutsch & Mulvaney, attorneys; Mr. Kelly of counsel and on the brief).
Michael A. Cifelli argued the cause for respondent North River Insurance Company (Hardin, Kundla, McKeon, Poletto & Polifroni attorneys).
Before Judges HAVEY, WELLS and PAYNE.
The opinion of the court was delivered by PAYNE, J.A.D.
This insurance case raises issues relating to the trigger of coverage and the allocation of the duty to provide indemnification for progressive environmental damage that commenced during a period of time in which coverage was offered customarily on an occurrence basis and continued into a period in which coverage was offered, if at all, on a claims-made basis. Their resolution requires some background.

I.
In its decision in Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994), the Supreme Court adopted a continuous-trigger theory of coverage under occurrence-based policies of comprehensive general liability (CGL) insurance for the risks of progressive, indivisible bodily injury and property damage arising from long-term exposure to asbestos and, presumptively, other toxic and environmental agents.[1] Under that theory, each policy of insurance in effect from the date of first exposure to an injury-producing substance to the date of manifestation of a progressive injury caused by the substance was held to provide coverage for that injury. See also, e.g., Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 712 A.2d 1116 (1998) (specifically applying a continuous trigger to coverage of damages caused by environmental contamination).
In adopting a continuous trigger, the Court specifically rejected, among others, triggers of coverage based solely upon the date of first exposure to the harmful product *70 (see, e.g., Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), clarified in part, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981)) or the date of manifestation of injury (see, e.g., Eagle-Picher Indus. v. Liberty Mutual Ins. Co., 682 F.2d 12 (1st Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983)), since those theories did not take into account the presumptively progressive and indivisible nature of the injury at issue, but were adopted solely as a means of maximizing coverage. See Owens-Illinois, supra, 138 N.J. at 449-459, 650 A.2d 974.
Additionally, the Court established a mechanism for allocating coverage for toxic tort liability between triggered insurance policies and corporate tortfeasors when coverage was afforded on an occurrence basis. It held that, in instances in which multiple policies of insurance were triggered as the result of the operation of a continuous-trigger theory, coverage should be allocated pro rata on the basis of the carrier's time on the risk and the degree of risk assumed: "i.e., proration on the basis of policy limits, multiplied by years of coverage." Id. at 475, 650 A.2d 974. The Owens-Illinois Court held further that, if coverage for the risk were available in a particular period, and if it had not been obtained by the corporate tortfeasor, the tortfeasor would share in the pro-rata allocation for the period and to the extent that it had, itself, assumed the risk of loss. Id. at 479, 650 A.2d 974. The allocation principles established by the Court in Owens-Illinois were adopted in the context of liability for environmental damage in Carter-Wallace, supra, 154 N.J. at 320-28, 712 A.2d 1116 (discussing exhaustion of coverage) and Quincy Mut. Fire Ins. Co. v. Bellmawr, 172 N.J. 409, 435-37, 799 A.2d 499 (2002) (discussing coverage of limited duration).

II.
The Owens-Illinois decision established a framework for allocation of liability in the context of occurrence-based CGL policies. However, the nature of insurance coverage has not remained static, particularly with respect to coverage of damages caused by environmental contamination.
In 1969, a major blowout at an offshore oil drilling rig near Santa Barbara led to the first Earth Day in April of that year. Thereafter, in 1970, Congress enacted the Clean Air Act, and in 1972, it enacted the Clean Water Act. Substantial environmental legislation imposing clean-up responsibilities on those causing pollution followed thereafter. See generally 1 Environmental Dispute Handbook: Liability and Claims (D. Carpenter, et al. eds.1991) at 7-33.
The insurance industry responded to this increase in environmental awareness and potential liability. Commencing in 1973, it adopted what has come to be known as a clarifying "sudden and accidental" or "standard" pollution exclusion from coverage by CGL policies. However, any restrictive effect intended by adoption of that exclusion was substantially nullified by the courts in decisions such as that reached by the Supreme Court in Morton Int'l v. General Acc. Ins. Co., 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), which held that the insurance industry's sudden and accidental pollution exclusion clause precluded coverage only for an insured's intentional discharge of known pollutants. Id. 134 N.J. at 30-86, 629 A.2d 831.
The insurance industry responded to adverse judicial precedent in 1986 by adopting an "absolute" pollution exclusion that did not contain the "sudden and accidental" *71 language construed by the courts interpreting the 1973 coverage form. In large measure, the absolute pollution exclusion has been judicially enforced, thereby excluding all but a very narrow category of pollution risks from coverage under CGL policies of insurance since 1986. See, e.g., Kimber Petroleum Corp. v. Travelers Indem. Co., 298 N.J.Super. 286, 299, 689 A.2d 747 (App.Div.), certif. denied, 150 N.J. 26, 695 A.2d 669 (1997). See generally, Kenneth S. Abraham, Environmental Insurance Law at 145-163 (1991); Hartford Fire Ins. Co. v. California, 509 U.S. 764, 771-76, 113 S.Ct. 2891, 2896-98, 125 L.Ed.2d 612, 622-26 (1993) (recounting a version of the history of the development of coverage forms in the context of a challenge based on alleged violations of the antitrust laws).
Commencing in the mid-1970s, new products were developed to meet the demand for insurance for environmental risks, including Environmental Impairment Liability (EIL) insurance, Environmental Protection Liability insurance and Pollution Liability insurance. Although the provisions of those policies, unlike policies of CGL insurance, were not standardized, the coverage was virtually always written on a "claims-made" basis, not on the "occurrence" basis construed by the Owens-Illinois Court in trigger of coverage and allocation contexts. See Abraham, supra, at 197. This distinction is significant, because claims-made insurance, by its language, is triggered by the manifestation of injury, which must take place during the policy period. As a consequence, the continuous trigger recognized in Owens-Illinois as applicable to occurrence-based policies and a theory of allocation based upon a continuous trigger are rendered less directly relevant in this circumstance.
In general, the issue of which carrier will respond to a risk under claims-made coverage is simplified by the fact that only those carriers providing coverage when the risk manifests can be held liable. The existence of prior claims-made coverage is thus relevant for purposes of continuity, but not for purposes of indemnification.[2]
However, the issue becomes infinitely more complicated when a risk is covered by a succession of policies written first on an occurrence and, in later years, on a claims-made basis or, as in the case before us, when the insured's environmental risks were covered by policies of CGL insurance until 1986, and were not covered by any form of insurance thereafter. The facts of this matter follow:

III.
In 1998, plaintiff Champion Dyeing & Finishing Company filed a declaratory judgment action against its CGL insurers, Centennial Insurance Company and North River Insurance Company, seeking reimbursement for the costs of investigation and remediation of pollution liability arising from fuel oil storage tanks that were found, in November 1997, to be leaking and for future costs incurred in addressing the contamination. The leakage was estimated to have commenced in January 1980. North River had provided primary and excess CGL coverage with total yearly policy limits of $1.5 million for the years *72 1980, 1981 and 1982. In the years 1983 through 1986, primary and excess coverage of $3.5 million per year was provided by Centennial. All policies were written on an occurrence basis and contained a "sudden and accidental" pollution exclusion that, as previously noted, has been held to be inapplicable if the environmental damage giving rise to a claim was neither expected nor intended by the insured.
After 1986, policies issued to Champion by Centennial and other insurers contained an absolute pollution exclusion. Champion states that it was unaware of the absolute pollution exclusion in coverage afforded to it, and therefore did not seek alternate coverage. In 1996, it was informed that it could not obtain insurance for air pollution, and it was informed as well that it could not obtain insurance that would cover any pre-existing problems with underground storage tanks.
In 1997, Champion contracted for the closure and removal of its two fuel oil storage tanks in connection with the refinancing of its industrial property. That removal, commenced in November 1997, disclosed corrosion and leakage causing contamination that had reached the groundwater. Statutory clean-up responsibilities were triggered as a result. Up to the time of trial, Champion had expended $126,527 in investigating and remediating the damage that had occurred.

IV.
Following a bench trial, the trial court held that Champion did not expect or intend the fuel oil contamination at issue, and thus coverage was not precluded under the "sudden and accidental" pollution exclusion contained in its CGL insurance. The court held additionally that coverage afforded by North River and Centennial from 1980 through 1986 under their occurrence-based CGL policies was triggered under Owens-Illinois' continuous trigger and thus that those carriers were obligated to respond to the loss. It also found that EIL insurance that would have covered the risk at issue was available to Champion and affordable to it in the years 1987 through 1997, but that Champion had not obtained that insurance. Therefore, the court interpreted Owens-Illinois to require an allocation to Champion for coverage purposes of those years in which it did not obtain environmental insurance. The court also held that the environmental risk assumed by Champion was in the face amount of the CGL coverage obtained to cover its other risks, which totaled $47 million. The court therefore allocated coverage of Champion's claim as follows: 6.9% to North River, 21.4% to Centennial, and 71.7% to Champion.[3]
Champion appeals from that decision, claiming: (1) the Court's determination in Owens-Illinois to allocate a percentage of risk to an insured that had chosen not to obtain available insurance should not be applied retroactively to conduct predating the Court's decision; (2) defendants failed to meet their burden of proving the availability and affordability of EIL insurance covering the risk at issue (leaks from underground storage tanks that were at least 20 years old); and (3) the court erred in considering all years from 1987 to 1997 in calculating the risk assumed by Champion, since EIL coverage was only available on a claims-made basis, and for that reason, at a maximum, coverage limits for only one year could be triggered. Champion's basic *73 position was that, because of the unavailability in 1997 of coverage for tanks that were more than twenty years old, North River should be held liable for 24.33% ( 4.5/18.5) and Centennial should be held responsible for 75.67% (14/18.5) of costs incurred by Champion in its environmental remediation.

V.
We reject Champion's first argument that the allocation scheme established by Owens-Illinois should not be applied retroactively so as to impose a portion of the risk upon insureds such as it that lacked coverage during a relevant period of time. A signal purpose of the Owens-Illinois decision was to develop an allocation mechanism applicable to the multitude of insurance disputes then pending, as well as to future disputes.
The final question that we must address, however, is whether our proposed solution will be an efficient response to the problem of insurance coverage for long-term environmental damage. The court, in Forty-Eight Insulations, aptly described the challenge:
The only thing on which all parties agree is that there is a need for us to arrive at an administratively manageable interpretation of the insurance policies-one that can be applied with minimal need for litigation....
[Owens-Illinois, supra, 138 N.J. at 474, 650 A.2d 974 (quoting Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., supra, 633 F.2d at 1218).]
To be sure, the Owens-Illinois Court sought in part to address future behavior by potential industrial insureds and to create incentives to purchase insurance. Id. 138 N.J. at 473, 650 A.2d 974. However, the focus of the Court was by no means wholly prospective, since if it had been, the rapidly multiplying number of disputes that generated its allocation scheme would remain unresolved. Nothing in the opinion suggests that the Court intended such an illogical and judicially impractical result.

VI.
We agree with Champion's second argument that defendants failed to prove the availability and affordability of EIL coverage for the risk of leakage from more than twenty-year-old underground storage tanks during the relevant time period, and we reverse on that ground. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 177 F.3d 210, 231 (3d Cir.1999) (discussing burden of proof).[4] In doing so, we emphasize the necessity of demonstrating that insurance could have been purchased that covered the precise risk that manifested, not simply that EIL insurance covering undefined risks was available. We also stress the necessity of demonstrating that the insurance was available at the time of manifestation and that conditions of coverage at that time were not such as to preclude indemnification, for example, as the result of the date of inception of the contamination. As noted, EIL coverage is written on a claims-made basis, not on an occurrence basis, and for that reason, it is crucial that insurance covering the risk exist at the precise time that damage becomes known.
We address first Champion's argument that the trial court erred in rejecting the position that an industrial claimant should be required to participate in the *74 allocation of an environmental loss only if it subjectively determined to "go bare." We disagree, and instead agree with the court's determination, pursuant to Chemical Leaman, supra, 177 F.3d at 231, that the insured's subjective knowledge of the availability of EIL insurance (i.e., whether the insured subjectively chose to go bare) is not relevant to the allocation issue. An inquiry into the intent and motivations of an insured in failing to obtain coverage constitutes an unnecessary and irrelevant diversion from the essential question of the existence or not of available and affordable coverage. If coverage is unavailable, no "decision" by the insured can be meaningfully made; if coverage is found to exist, a focus on subjective intent could encourage lack of diligence in obtaining such insurance on the part of cash-strapped businesses. Cf. also Olin Corp. v. Insurance Corp. of N. Am., 221 F.3d 307, 326 (2d Cir.2000) (rejecting subjective approach under New York law).
We next address Champion's argument that testimony at trial failed to demonstrate the availability in 1997 of insurance providing coverage for the risk at issue. At trial, expert testimony on the issue of availability was presented on behalf of the defense by Alexander Wayne,[5] who testified that he had been employed by various international intermediary brokers to develop environmental insurance programs and to place environmental risks with insurers, and later established his own business to perform similar functions. However, Wayne was not licenced as an insurance broker in New Jersey after 1989, could not produce any applications for EIL coverage during the relevant time, produced no underwriting criteria for the period from 1986 through 1997,[6] and could recall only two New Jersey environmental insurance clients that were not petroleum marketers eligible for coverage afforded to that industry.[7] Wayne could not recall if either of the two clients had sought coverage for underground storage tanks. Thus, the foundation for any opinion on his part is suspect.
Significantly, Wayne admitted that the fact that Champion's property contained fuel oil storage tanks that were over twenty years old in 1997 was an important factor in determining the availability of coverage. Further, Wayne testified that AIG, a carrier that he stated was still writing environmental coverage in the contracting market that existed in 1997, would not insure underground storage tanks that were twenty or more years old. Moreover, Wayne testified:
I would have to say in all candor that it would probablyif Champion had a very old tank in 1997, it would have been very difficult for them to getor if they had evidence that it was leaking, it would have been difficult for them to get the insurance in 1997 without a retro date.
As Wayne noted, some policies of claims-made insurance contained retroactive (retro) coverage provisions that limited coverage to risks commencing after a specified date. Coverage would not exist for *75 leakage commencing prior to a policy's retro coverage date, even if the leakage was not manifest until a date within the retro period.[8]
Wayne's testimony, therefore, failed to support defendants' claim that insurance was available in 1997 that would have covered leakage commencing in 1980.
In testimony regarding the nature of available coverage, Wayne confirmed that environmental insurance during the relevant period was written on a claims-made basis and, generally, with coverage limits of one million dollars per occurrence and two million dollars aggregate or, at most, two million dollars per occurrence and six million dollars aggregate.[9] He also confirmed that claims-made policies issued in years prior to manifestation of a loss would not be contractually required to respond to that loss. The following exchange occurred:
Q ... Going back to my hypothetical which was starting January 1st of 1987 when Champion could have purchased EIL coverage on a yearly basis with a million dollars worth of coverage and had continued to do so year after year, up through and including the period, say 1997 through 1998. Okay? Are you with me so far?
A Yes.
Q Good. And let's further assume that the tanks had been removed in November of 1997 contamination found and a claim tendered at that point in time. How many policies would have been triggered? Just the 1997 through 1998 policy, correct?
A Correct.
* * *
Q And there's only $1 million worth of coverage under my set of facts that would have been available to Champion, Correct?
A Yes.
Champion's expert, small-business insurance broker Joanne Ralph, testified that, in 1986, coverage for the environmental risks posed by small businesses such as Champion's disappeared, and that coverage remained unavailable for aged underground tanks into the 1990s. As she noted, Champion's tanks had been installed in 1961, and therefore were already twenty-six years old in 1987. "[T]here was knowledge that tanks over 20 years old were problematic and that the insurance industry, even into the `90s, was not willing to write tanks of that age." Further, testimony was provided by Champion employee Mohammed Younes, who stated that he had sought environmental liability insurance from the Steel Agency in 1996 and had been informed that coverage was unavailable for existing underground tanks.
We find no support in the record for the court's conclusion that Steel had recommended that Champion obtain EIL insurance, and Champion had declined. We also find that the court's determination, based on an unaccompanied site visit, that Champion ignored the need for insurance as it had ignored its housekeeping obligations, was improper and constituted error. The fact that Champion consented to the inspection certainly did not signal *76 its agreement to a determination of allocation issues, in part, on the basis of the result of that inspection, and in utilizing the visit in that fashion, the court impermissibly relied upon matters wholly outside the record and on inferences that lacked any basis whatsoever.
We also agree with Champion that the court erred in determining for allocation purposes that Champion should be considered to have assumed the risk for all of the years in which it lacked environmental coverage. The testimony at trial suggested that the maintenance of policies during each of those years might have been required in order to avoid an unduly restrictive retro date. However, it also established unequivocally that the insurer providing claims-made coverage at the time of manifestation of a progressive injury was obligated to cover the full extent of that injury, including those portions of the injury occurring in years prior to the claim. The only limitations in that regard would exist as the result of the duration of the retro period and the size of policy limits. As recognized by Wayne, no carrier providing claims-made coverage in years prior to manifestation could be called upon to provide indemnification for the damage that eventuated. Only the amount of coverage afforded in the year that the claim was made would have been available to Champion.

VII.
As a final matter, we address the proper allocation of coverage in this matter. Our determination that no claims-made coverage could have been obtained by Champion for 1997, the year in which the loss manifested, creates a potential gap in coverage from the end of 1986 forward. The defendant insurers argue that they should not be held liable for that gap, and take the position that occurrence-based insurance does not operate prospectively to afford coverage for injuries sustained after the policy period has ended. We do not read Owens-Illinois in that fashion and instead find that it recognized an insurer's obligation to indemnify for subsequent damages attributable to an injury occurring during the relevant policy period. In its decision, the Owens-Illinois Court addressed the position of the defendant insurers with respect to allocation that their agreement to pay "all sums which the insured shall become legally obligated to pay * * * as damages because of personal injury or property damage" was qualified by the statement that "[t]his insurance applies only to personal injury or property damage which occurs during the policy period * * *." Relying on this language, the insurers argued that their policies did not apply to injuries occurring beyond the policy period. This argument was rejected by the Court, which stated:
As to the Insurance Companies' argument that all injury (or damages) must occur in the policy period or that indemnity is awarded for only the part of the injury that occurs during the policy period, consider the simple case of an automobile accident in 1994 with a definite prognosis that an injured occupant's spine will deteriorate in 1995 resulting eventually in paralysis. The policy in effect during 1994 must indemnify for all damages attributable to the 1994 accident even though the full extent of the damages or the injury will not take place until a future date.... In addition, the argument that all sums to be assessed because of long-term exposure to asbestos could have been established in any one of the policy years is intuitively suspect and inconsistent with our developing jurisprudence in the field of toxic torts. supra, at 458[, 650 A.2d 974], citing Ayers [v. Jackson Twp.] 106 N.J. 557 [, 525 A.2d 287 (1987) ] and Mauro *77 [v. Raymark Indus., Inc.] 116 N.J. 126 [, 561 A.2d 257 (1989) ].
[Owens-Illinois, supra, 138 N.J. at 465-66, 650 A.2d 974.]
See also Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1203 (2d Cir.1995) (adopting the rationale of Owens-Illinois in this context), mod. on denial of reh'g, 85 F.3d 49 (2d Cir.1996); James F. Hogg, The Tale of a Tail, 24 Wm. Mitchell L.Rev. 515, 565 (1998).
As a consequence, we find that the duty to indemnify Champion in this case should have been apportioned solely among Champion's insurers, Centennial and North River, in accordance with the formula adopted by Owens-Illinois, and that the trial court's failure to do so was reversible error.[10] Our decision in this regard does not render unlimited the liability of the two insurers in this matter. That liability is capped by the limits of coverage afforded by each. Thus, if liability exceeds the amount of available insurance, that liability will have to be borne by Champion itself. This result, we find, best satisfies the underlying contractual obligations of the insurers in this matter, as well as the reasonable expectations of their insured, Champion.
Reversed.
NOTES
[1] The case concerned coverage of damage from asbestos, and the Court's decision on allocation arguably was limited to that product. Id. at 474-75, 650 A.2d 974. However, the Court's language, framed often in terms of "environmental disease or damage" was broader, and the reasoning of the decision has been extended far beyond asbestos-related coverage litigation. See Quincy Ins. Co. v. Borough of Bellmawr, 172 N.J. 409, 420-423, 435, 799 A.2d 499 (2002).
[2] If continuous claims-made coverage exists, an insured may be able to avoid the imposition of a retroactive (retro) coverage provision that limits coverage only to those events that have their inception within the retro period. If a claims-made policy issued this year, for instance, contained a ten-year retro limitation, that policy would not provide coverage for injury or damage commencing twenty years ago, even if the injury or damage manifested during the policy's term of coverage.
[3] As fractions, coverage was allocated by the court as follows: North River-4.5/65.5; Centennial-14/65.5; Champion-47/65.5. The numerator of the fraction represents the dollar value of coverage afforded or assumed by the entity being charged. The denominator represents total coverage.
[4] The burden of proof in this case is not significant, since we find that Champion adduced irrefuted proof that EIL coverage for its underground tanks was unavailable when the damage was discovered.
[5] Lay testimony on the issue of availability was elicited by North River through Crum & Foster employee Roger Prichett. However, he testified that he lacked knowledge of availability after 1993, and his knowledge prior to that date was not first-hand.
[6] Wayne stated that such information was proprietary and remained in the possession of his former employers. However, he produced nothing from his own business, either.
[7] Coverage for them existed as the result of aggressive oil company sponsored tank replacement programs that provided assurance that risks from leakage had been eliminated.
[8] See also Abraham, supra, at 103 n. 24 (providing confirmation of Wayne's analysis of the effect of a short retro date).
[9] We thus find the court's determination of the amount of coverage assumed by Champion to be factually unsupported, since that amount was simply borrowed from existing CGL coverage limits, without any evidential basis for finding that the coverage amounts would have been equivalent. However, our resolution of this case makes this error irrelevant.
[10] If Champion had been able to purchase, say, $2 million in EIL coverage in 1997, total relevant coverage would have been $20.5 million. North River's obligation would be 4.5/20.5; Centennial's would be 14/20.5; and Champion's would be 2/20.5. Any intervening claims-made coverage could not be considered, since such coverage could not be triggered.