**ANDOVER NEWTON THEOLOGICAL SCHOOL, INC., Plaintiff, Appellee,**

v.

**CONTINENTAL CASUALTY CO., Defendant, Appellant.**

**Nos. 91–2046, 91–2218.**

United States Court of Appeals, First Circuit.

Heard April 6, 1992.

Decided May 28, 1992.

Thomas S. Schaufelberg with whom Gregory J. Manderlink, Joan M. Griffin were on brief, for defendant, appellant.

Leonard F. Clarkin with whom Harry C. Beach and Paul B. Bottino were on brief, for plaintiff, appellee.

Before CYR, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

This is the third time that we face issues arising out of a 1987 jury verdict which found that Andover Newton Theological School, Inc. (Andover) willfully violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, in terminating Dr. Linn, a tenured professor. We affirmed that verdict in *Linn v. Andover Newton Theological School, Inc.*, 874 F.2d 1 (1st Cir.1989).

Thereafter Andover filed a claim for its losses with its insurance carrier, Continental Casualty Company (Continental). Continental refused to pay the claim, asserting that, under Andover's policy and Massachusetts law, it was not obligated to reimburse the school for damages assessed because of a willful violation of the ADEA.[1] In the suit subsequently filed, the district court granted summary judgment to Continental. On appeal from that decision, we learned that the judge in the Linn trial had instructed the jury concerning willfulness as

1. Mass.Gen.Laws Ann. ch. 175, § 47 Sixth (b) (West 1987) provides that:

Companies may be incorporated under and subject to the provisions of this chapter for the following purposes:

\* \* \* \* \*

To insure ... any person against legal liability for loss or damage on account of the injury or death of any other person or on account of any damage to property of another, *except that no company may insure any person against legal liability for causing injury, other than bodily injury, by his deliberate or intentional crime or wrongdoing....* (Emphasis supplied.)

follows: an entity "acts 'willfully if it knows its conduct was prohibited by federal law or if it acts in reckless disregard as to whether its conduct is prohibited by federal law.'" We thereupon certified to the Massachusetts Supreme Judicial Court (SJC) the following question:

> Does a finding of willfulness under the Age Discrimination in Employment Act (ADEA), if based on a finding of "reckless disregard as to whether [defendant's] conduct is prohibited by federal law," constitute "deliberate or intentional ... wrongdoing" such as to preclude indemnification by an insurer under the public policy of Massachusetts as codified at Mass.Gen.L. ch. 175, § 47 Sixth (b)?

*Andover Newton Theological School v. Continental Casualty Co.*, 930 F.2d 89 (1st Cir.1991) (*Andover I*). The SJC answered, "no." *Andover Newton Theological School, Inc. v. Continental Casualty Co.*, 409 Mass. 350, 353, 566 N.E.2d 1117 (1991). We concluded that there was a possibility that the jury in the Linn case had based its determination on a finding of reckless disregard rather than on a determination that Andover knew its actions were wrongful. *Andover I*, 930 F.2d at 93. Consequently, we held that the district court erred in granting summary judgment to Continental and remanded the case.

### The District Court's Rulings

The district court made four rulings on remand. It first ruled, over Andover's objection, that its responsibility was not merely to assess attorney's fees but to "hold a hearing to resolve the issue identified in the First Circuit decision as an issue not resolved by the jury...."

The second ruling decided the issue to be resolved at the hearing, namely, "whether the responsible people at the school committed a knowing ... as opposed to a reckless violation of federal law in their discharge of Mr. Linn." The court thereafter examined what it termed "entirely a cold record" consisting of documents and excerpts from the transcript of testimony. It heard no live witnesses.

Thirdly, the court ruled that the burden of proving that Andover's conduct amounted to "deliberate or intentional crime or wrongdoing" (and thus was uninsurable) rested with the insurer. The court referred to the proviso in the policy stating that "loss shall not include fines imposed by law or matters ... *deemed uninsurable under the law pursuant to which this policy shall be construed.*" (Emphasis supplied.) This provision, the court noted, was not in the insuring clause but rather in the definitions section of the policy. The court therefore deemed it "the functional equivalent of an exclusion." Under Massachusetts law, the burden to show that conduct falls within the range of an exclusion lies with the insurance company.

Finally, the court made the following principal findings of fact:

1. Andover's Dean Peck had written a memorandum to the faculty dated October 27, 1980, expressing concern that certain federal regulations would raise from sixty-five to seventy the age at which mandatory retirement would be allowed under the ADEA. (All agree that these regulations concerned a prospective amendment to the Act.)

2. Dean Peck's memorandum showed a concern for the future age profile of the school and an awareness of the existence of the ADEA, but did not indicate a "specific conscious knowledge of the protections of the Age Discrimination Employment Act which of course commenced at age 40."

3. Dean Peck sought the advice of counsel as to the legality, in light of the prospective amendment to the ADEA, of a proposal to abolish tenure at the school at age sixty-five.[2]

---

**2.** Andover chose not to submit any testimony by this attorney, either at the Linn trial or the subsequent "paper hearing" in the district court. Continental maintains that the attorney would have provided officers of the school with a full exposition of the provisions of the ADEA. A consequence of the district court's assigning the burden of proof to Continental, rather than the school, however, was to bar the drawing of any such adverse inference.

4. Provisions of the ADEA undoubtedly had been posted in appropriate places throughout the school.

5. After receiving a letter dated November 17, 1980, from Andover's president announcing the need to reduce faculty costs by $60,000–$250,000, the Dean discharged Dr. Linn. While the decision to reduce expenses (by $50,000) was made in good faith, the decision to discharge Dr. Linn was motivated "primarily by the fact that he was the oldest faculty member who was not planning to take early retirement...."

6. Although this was a "shameful" incident and a "violation of federal law," the "bar to coverage on the basis of public policy arises only if an intentionally committed, wrongful act was also done deliberately or intentionally in the sense that the actor knew that the act was wrongful and consciously appreciated the illegality of its act."

7. The officers of Andover did not act with such knowledge or conscious appreciation.

Andover takes issue with the court's first ruling, presumably as an alternative ground for affirmance. Continental appeals from the remaining rulings.[3]

## Scope of the Proceedings

Andover asserts that our last opinion in this case left only one issue for decision on remand—an assessment of the actual cost to the school of defending the Linn action.[4] Andover appears to suggest that the court ought to have entered judgment for it on its insurance claim without further inquiry. It therefore challenges the district court's decision to address the question, left unanswered by the Linn jury, of whether the school had knowingly (as opposed to recklessly) violated the ADEA. In so arguing, the school relies upon our statement that "[o]n remand, the district court should receive proof of the amounts actually expended by Andover and establish the amount of

Continental's obligation accordingly." *Andover I*, 930 F.2d at 96. That comment, however, appears in a paragraph devoted solely to the issue of Continental's obligation to reimburse Andover for defense costs and, specifically, to the question of how to calculate them. We do not read it as necessarily defining the full extent of any future proceedings. Our closing statement, for example, contained a general direction that the case be "remanded for further action in accordance with this opinion."

■ As Andover points out, it is somewhat anomalous to expect a judge to unscramble eggs by resolving an issue left open by an ambiguous jury verdict. On the other hand, we did state that Continental's liability for Andover's defense costs would exist "regardless of whether the termination *ultimately is found to have been taken* in knowing violation of federal law." *Id.* (Emphasis supplied.) This, along with the general tenor of our opinion, seems to us to imply that further proceedings in the district court were contemplated.

In any event, we should be very loath to attempt to second guess the district court in the exercise of its judgment as to what may be the fairest way to deal with a case on remand, unless we have given the clearest of instructions. We therefore find no error in the court's decision to hold a hearing on the cold record and make findings.

## The Issue on Remand

Continental argues at length that in deciding whether Andover intentionally, as opposed to recklessly, violated the ADEA, the district court misinterpreted our opinion in *Andover I* (construing the SJC's decision) and applied the wrong legal standard. We confess to having some difficulty in understanding the burden of Continental's argument but read it as saying that the issue was not whether the school acted in knowing violation of the law but, rather, whether it had a "specific intent to do

---

**3.** Continental filed two appeals which, raising the same issues, have been consolidated.

**4.** In *Andover I* we held that, whether or not Continental would have to indemnify Andover

for Dr. Linn's damages, it was bound to reimburse the school for the cost of defending the suit.

something the law forbids," (quoting partially a statement we made at *Andover I*, 930 F.2d at 92 n. 3). At oral argument, Continental suggested an alternative intent standard: whether Andover knew that its conduct was "wrongful." According to Continental, age-based discrimination is wrongful even in the absence of the ADEA. Thus, under either of the theories advanced by Continental, the fact—established by both the Linn jury and the district court on remand—that Andover knowingly discriminated against Dr. Linn on the basis of his age, conclusively established an "intentional" and, thus, uninsurable, violation of the ADEA.

We have no difficulty in rejecting this argument. In the first place, the SJC could not have been clearer in its equation of knowledge of wrongfulness with knowledge of a violation of the law. We quote the pertinent passages:

> Here we deal with conduct that may not have been a deliberate or intentional, and thus *knowing, violation of Federal law.* The conduct in this case, although a violation of law, may have been undertaken with reckless disregard *as to whether it was unlawful.* This discharging of a tenured professor was intentional.... The fact that a wrongful act was committed intentionally, however, does not alone bar coverage. That bar arises only if an intentionally committed, wrongful act was also done deliberately or intentionally, in the sense that the actor *knew that the act was wrongful.* (Emphasis supplied.)

409 Mass. at 352, 566 N.E.2d 1117.

In the second place, we do not think that our opinion reasonably lends itself to Continental's construction. Indeed, if we had disagreed with the SJC's answer—if that could be imagined on a question of Massachusetts law as to which we had asked that court's opinion—we would have said as much in the several places where we indicate our appreciation of the SJC's ruling. We stated that the jury could have found that Andover discriminated "without consciously appreciating the illegality of its act." *Andover I,* 930 F.2d at 93. Moreover, as we have noted, we referred to Continental's liability for defense costs "re-gardless of whether the termination ultimately is found to have been taken in knowing violation of federal law." *Id.* at 96. We also noted that recovery would be barred if the jury found "Andover knew its actions were wrongful." *Id.* at 92–93.

The only source of comfort for Continental lies in our statement in a footnote that "[i]n other words, Massachusetts law only proscribes coverage of acts committed with the *specific* intent to do something the law forbids." *Id.* at 92 n. 3. Under Continental's view, the determination that Andover discharged Dr. Linn because of his age and in violation of the ADEA would preclude coverage. However, Continental failed to cite the footnote in its entirety. Immediately following the language relied upon by Continental, we stated: " ' "An act is done 'willfully' if done voluntarily and intentionally, and with the specific intent to do something the law forbids; *that is to say, with bad purpose either to disobey or to disregard the law."* ' " *Id.* (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1020 n. 27 (1st Cir.1979)) (quoting E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 14.06, at 384 (3d ed. 1977)). (Emphasis supplied.)

We therefore conclude that the district court correctly interpreted our opinion which, in turn, faithfully reflected the ruling of the SJC.

### Burden of Proof

In evaluating the district court's decision to place on Continental the burden of proving Andover's conduct uninsurable under Mass.Gen.Laws Ann. ch. 175, § 47 Sixth (b), some sense of the structure of Continental's policy is necessary. The policy consisted of eight general sections. In Section I, entitled "Insuring Clause," Continental agreed to pay "for all loss which the said Assureds or any of them shall become legally obligated to pay." Section III is entitled, "Definitions." After defining the terms "School District," "Assureds," and "Wrongful Act," it defines "Loss" as:

> any amount which the Assureds are legally obligated to pay or for which the School District may be required or permitted to pay as indemnity to the Assureds, for a claim or claims made

against the Assureds for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions (excluding from such costs of investigation and defense salaries of officers or employees of the School District or any other government body) claims or proceedings and appeals therefrom, cost of attachment or similar bonds provided always, however, such subject of loss *shall not include* fines imposed by law, or matters which shall be deemed uninsurable under the law pursuant to which the policy shall be construed.

(Emphasis supplied.)

Following this section is Section IV, entitled "Exclusions."

We observe preliminarily that, like the SJC, we may have assumed (not unnaturally) that the "shall not include" clause contained in the definition of loss provision was an exclusion. The SJC, in referring to this clause, stated that "An insurer may, of course, resolve uncertainties in the scope of cl. Sixth (b) by defining its own *coverage exclusion* in its insurance policy." 409 Mass. 350 n. 1, 566 N.E.2d 1117. (Emphasis supplied.) In our own opinion we made no fewer than three references to this clause as an exclusion.[5]

Since these statements may not have been conscious holdings, we supplement them by citing authoritative Massachusetts law. In *Murray v. Continental Insurance Co.*, 313 Mass. 557, 560, 48 N.E.2d 145 (1943), an insurance policy insured "against all direct loss and damage by 'sprinkler leakage,' *except as herein provided....*" (Emphasis supplied.) On a subsequent page of the policy a section entitled "Hazards not Covered" provided that the company would not be liable for damage from, among other events, a wind storm. The insurance company, contesting a verdict for plaintiff, argued that the burden of proof should be on the plaintiff to

show that the break in its sprinkler system was not caused by a wind storm that occurred at about the same time as the sprinkler damage.

The court faced the question whether the words "except as herein provided" could be read as importing into the coverage clause the exclusion of the risk of wind storm. The court answered this in the negative. Even the words "except as herein provided," it found, could "not make the exceptions contained in the 'Hazards not covered' clause a part of the insuring clause...." *Id.* at 563, 48 N.E.2d 145. Accordingly, the court declined to shift the burden of proof from the insurance company to the insured. In the case before us, of course, there are *no* words of reference in the insuring clause.

In an earlier case, *Lunt v. Aetna Life Insurance Co.*, 253 Mass. 610, 149 N.E. 660 (1925), the court considered an insurance company's contention that the plaintiff's pleading was defective because it failed to "negate various conditions in the policy." In resolving the issue, the court relied upon the following:

'The rule of pleading a statute which contains an exception is usually expressed thus: "If there be an exception in the enacting clause, the party pleading must show that his adversary is not within the exception; but if there be an exception in a subsequent clause or subsequent statute, that is matter of defence, and is to be shown by the other party." The same rule is applied in pleading a private instrument of contract. If such instrument contain in it, first, a general clause, and afterwards a separate and distinct clause which has the effect of taking out the general clause something that would otherwise be included in it, a party, relying upon the general clause, in pleading, may set out that clause only, without noticing the separate and distinct clause which operates as an exception....'

---

**5.** We first said that "[c]overage for wrongful acts ... is limited by a specific exclusion of those 'subjects of loss' deemed uninsurable under Massachusetts law." *Andover I,* 930 F.2d at 95. We subsequently noted that "exclusions must state clearly what items are to be exclud-

ed...." *Id.* Finally, we stated that "[i]n this case ... there is no dispute that the policy covers "wrongful acts" of the type that occurred here. It is only the scope of the *exclusion* that is at issue, and the exclusion language is narrow." *Id.* at 96.

*Lunt*, 253 Mass. at 614, 149 N.E. 660 (quoting *Commonwealth v. Hart*, 11 Cush. 130 at 134). *See also Ratner v. Canadian Universal Insurance Co. Ltd.*, 359 Mass. 375, 379, 269 N.E.2d 227 (1971) (quoting similar language from *Murray*, 313 Mass. at 563, 48 N.E.2d 145).

We see common sense in these rulings. If an insurer were able to distribute provisions limiting liability throughout a policy, with the expectation that its shouldering of the burden of proof would be limited to the single section entitled, "Exclusions," this would create considerable incentive to obfuscation and subterfuge.

Moreover, conceding that the intent of the provisions at issue in this case is a matter of some ambiguity, we observe that "doubts created by any ambiguous words or provisions are to be resolved against the insurer." *Camp Dresser & McKee, Inc. v. Home Insurance Co.*, 30 Mass.App. 318, 324, 568 N.E.2d 631 (1991).

We recognize that there may be grounds for distinguishing purely contractual exclusions, such as that at issue in *Murray*, from those created by state law. Presumably, the insurer, to a greater degree than the insured, will set the terms of the former. Neither party, on the other hand, exercises particular control over the latter. Rather, applicable state law is presumed automatically to "enter into and become a part of the [insurance] contract," 1 G. Couch, *Cyclopedia of Insurance Law 2d*, § 13:6 (rev. ed. 1984).

We fail to see how this distinction requires a different result on the burden of proof question. One of the two parties will have to prove the applicability of the statutory exclusion. In deciding which, the same principles at play in the context of contractual exclusions—i.e., deterring obfuscation and resolving doubts in favor of the insured—would appear to apply. Here, not only has the insurer placed its reference to the statutory exclusion outside the general coverage provision, but the applicability of the exclusion, as this case so well illustrates, is not readily ascertainable. Under these circumstances, we think it entirely appropriate to require the insurer to prove the effect of the statute.

We therefore conclude that the district court correctly assigned Continental the burden of proof in this action.

Application of the Standard to the Facts

■ Continental, assuming *arguendo* the correctness of the intent standard applied by the district court, contends that the evidence on remand permitted only one conclusion, that Andover discharged Dr. Linn in knowing violation of the ADEA. It therefore challenges the district court's finding to the contrary. Of course, we will sustain a judge's general conclusions, applying the law to the facts, unless they are clearly erroneous. We find no such error here.

In support of its argument, Continental asserts that Dean Peck's October 27, 1980, memorandum to the faculty demonstrated that "the Dean was not only aware of the ADEA but was familiar with its application." According to Continental, "implicitly [the] memorandum indicates that Dean Peck ... knew that as of the fall of 1980, the ADEA prohibited age based discrimination against more senior faculty members prior to their reaching age 65." Continental also seeks comfort in the fact, inferred by the district court, that posters providing information about the ADEA had been placed in conspicuous places on Andover's premises.

We observe first that Dean Peck's testimony presented to the district court consists of the following examination by counsel for Dr. Linn:

Q  Now, Dr. Peck, did it come to your attention in the fall of 1980 that there was a change in the federal law, including the retirement of faculty at schools and colleges.

A  Yes.

Q  And was that change in the form of an amendment to the Age Discrimination in Employment Act?

A  I do not recall that.

Q  In any event, it was part of the Age Discrimination in Employment Act?

A  That is not my area of expertise. I'm sorry. It probably was, but I don't know.

Q You don't know whether it was sort of a regulation or part of a law passed by Congress?

A If I did then, I don't recall knowing that.

Q Now, in any event, whether it was a law or a regulation, what did you understand the change was?

A It was to make mandatory retirement at an age lower than 70 impossible.

Q And, Dr. Peck, when was that law to become effective?

A I do not recall. I'm sorry.

Q Well, was it in 1980 or was it later?

A My memory is that it was later.

\* \* \* \* \* \*

Q And was it your concern that mandatory retirement at age 65 gave you a sort of general honorable way of retiring people who began to show evidence of slipping, shall we say?

A Yes.

Q And that you were concerned that if faculty got over age 65 and began to slip a little bit, it would be very, very difficult to remove them?

A Given tenure, yes.

Appendix pp. 86–87, 88.

This is the extent of Dean Peck's testimony concerning his knowledge of the ADEA. Counsel for Dr. Linn posed no questions concerning the Dean's knowledge of the impact of the ADEA on personnel below age sixty-five, such as Dr. Linn, who was sixty-two at the time of his termination.

The absence of any examination of Dean Peck's knowledge of the application of the ADEA in circumstances other than those surrounding the proposed change requires us to speculate. While it might be permissible to infer such knowledge from what was directly proven at trial, we think it would be improper to do so in this context.

We might agree, for example, that Dean Peck, from his general awareness of the ADEA, may have understood that employees under age sixty-five were generally protected from discriminatory action. But we must also take into account the fact that, subsequent to his October memorandum to faculty, the Dean was faced with an ultimatum from the president, made in good faith, i.e., without any ulterior motive, to make drastic cuts in the cost of running the school. For us to say that the evidence of record indicates that the Dean *knew* that the ADEA forbad a discharge of a protected person where such act was perceived to be compelled by a financial crisis, is too big a leap for us to make.[6]

We could take the step to negligence. Possibly we could jump to gross negligence and even recklessness. We might even go farther and, were we the factfinder, conclude that there had been conscious appreciation of illegality. But we cannot, on this record, make the ultimate leap of concluding that the district court was clearly erroneous in finding that such knowledge was lacking.

*Affirmed.*

---

**6.** Our conclusion in this regard is in no way altered by the fact that the *Linn* jury found financial necessity not to constitute a legal defense to the ADEA claim.