712 A.2d 1116

CARTER–WALLACE, INC., A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF–RESPONDENT, v. ADMIRAL INSURANCE COMPANY, A CORPORATION OF THE STATE OF DELAWARE, ALLSTATE INSURANCE COMPANY (AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY, FORMERLY NORTHBROOK INSURANCE COMPANY AND NORTHBROOK INDEMNITY COMPANY), A CORPORATION OF THE STATE OF ILLINOIS, AMERICAN HOME ASSURANCE COMPANY, A CORPORATION OF THE STATE OF NEW YORK, AMERICAN RE–INSURANCE COMPANY, A CORPORATION OF THE STATE OF DELAWARE, ASSOCIATED INTERNATIONAL INSURANCE, A CORPORATION OF THE STATE OF CALIFORNIA, CALIFORNIA UNION INSURANCE COMPANY, A CORPORATION OF THE STATE OF CALIFORNIA, COLUMBIA CASUALTY COMPANY, A CORPORATION OF THE STATE OF ILLINOIS, EMPLOYERS INSURANCE OF WAUSAU, A CORPORATION OF THE STATE OF WISCONSIN, FIRST STATE INSURANCE COMPANY, A CORPORATION OF THE STATE OF DELAWARE, HOME INSURANCE COMPANY, A CORPORATION OF THE STATE OF NEW HAMPSHIRE, INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, A

CORPORATION OF THE STATE OF ILLINOIS, UNDERWRITERS AT LLOYD'S LONDON, NOS. 1 TO 200, BEING FICTITIOUS NAMES, LONDON MARKET INSURANCE COMPANIES, NOS. 1 TO 200, BEING FICTITIOUS NAMES, THE MUTUAL FIRE, MARINE & INLAND INSURANCE, A CORPORATION OF THE STATE OF PENNSYLVANIA, NEW JERSEY PROPERTY–LIABILITY INSURANCE GUARANTY ASSOCIATION, NEW JERSEY SURPLUS LINES INSURANCE GUARANTY FUND, THE AETNA CASUALTY AND SURETY COMPANY, A CORPORATION OF THE STATE OF CONNECTICUT, THE CONTINENTAL INSURANCE COMPANY, A CORPORATION OF THE STATE OF NEW HAMPSHIRE, THE NORTH RIVER INSURANCE COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, UNITED STATES FIRE INSURANCE COMPANY, A CORPORATION OF THE STATE OF NEW YORK AND ZURICH INSURANCE COMPANY, A FOREIGN CORPORATION, DEFENDANTS, AND COMMERCIAL UNION INSURANCE COMPANY, (AS SUCCESSOR TO EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY), A CORPORATION OF THE STATE OF MASSACHUSETTS, DEFENDANT–APPELLANT.

Argued April 27, 1998—Decided July 8, 1998.

314

*James W. Christie, III*, argued the cause for appellant (*Christie, Pabarue, Mortensen and Young*, attorneys; *Mr. Christie* and *Peter J. Lynch*, of counsel and on the briefs).

*C. MacNeil Mitchell*, a member of the New York bar, argued the cause for respondent (*Porzio, Bromberg & Newman*, attorneys; *Mr. Mitchell, Donald Jeffrey Campbell* and *Charles Stoia*, of counsel and on the briefs).

*Brian R. Ade* argued the cause for *amici curiae* Fireman's Fund Insurance Company and Hartford Accident & Indemnity Company (*Gilberg & Kiernan*, attorneys; *Robert F. Walsh*, of counsel; *Mr. Ade, Mr. Walsh* and *Anthony J. LaPorta*, on the brief).

*Kevin J. Bruno* submitted a joint brief on behalf of amici curiae Alco Industries, Inc., The Boc Group, Combustion Engineering, Inc., Eastman Kodak Company, The Flintkote Company, Genstar Corporation, Illinois Tool Works Inc., Millenium Holdings Corp., Pfizer Inc., PPG Industries, Inc., Princeton Gamma Tech Inc., The Stearns & Foster Bedding Company, Schlumberger Ltd., Unisys Corporation, Warner–Lambert Company and Wheeling Pittsburgh Steel Corporation (*Hannoch Weisman*, attorneys for Alco Industries, Inc., Combustion Engineering, Inc., Illinois Tool Works Inc., PPG Industries, Inc., Princeton Gamma Tech Inc., The Stearns & Foster Bedding Company, Schlumberger Ltd. and Unisys Corporation; *Gregory J. Schwartz* and *Laurie J. Sands*, of counsel; *McCarter & English*, attorneys for The Flintkote Company and Genstar Corporation; *Gita Rothschild*, of counsel; *Dughi and Hewitt*, attorneys for Warner Lambert Company; *Russell L. Hewit* and *Daniel R. Lindemann*, of counsel; *Anderson Kill & Olick*, attorneys for The Boc Group, Millenium Holdings Corp., Pfizer Inc., and Wheeling Pittsburgh Steel Corporation; *Paul E. Breene*, of counsel, and *Sills Cummis Zuckerman Radin Tischman Epstein & Gross*, attorneys for Eastman Kodak Company; *Phillip R. Sellinger* and *Jeffrey M. Pollock*, of counsel).

*Laurie B. Epstein* and *William G. Passannante* submitted a brief on behalf of amicus curiae United Policyholders Inc. (*Anderson, Kill & Olick*, attorneys)

*Susan Stryker* submitted a brief on behalf of amicus curiae National Association of Independent Insurers (*Sterns & Weinroth*, attorneys).

*Wilson M. Brown, III*, and *John F. Schultz* submitted a brief on behalf of amici curiae Lumbermens Mutual Casualty Company, American Motorists Insurance Company and American Manufacturers Mutual Insurance Company (*Drinker, Biddle & Reath*, attorneys).

*Robert D. Chesler* submitted a brief on behalf of amicus curiae Marisol, Incorporated (*Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys).

*Wendy L. Mager* submitted a brief on behalf of amicus curiae Insurance Environmental Litigation Association (*Smith, Stratton, Wise, Heher & Brennan*, attorneys).

*Steven Jakubowski* submitted a letter brief on behalf of amicus curiae Federal Insurance Company.

*Charles W. Miller, III*, submitted a brief on behalf of amicus curiae The Travelers Indemnity Company (*Norris, McLaughlin & Marcus*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

This appeal involves the availability and allocation of insurance coverage for costs incurred at an environmental cleanup site in Monmouth County. Specifically, it requires us to determine how the responsibility of an excess insurer is measured in the context of environmental damage with a continuous trigger of liability over many years. Also presented are the issues whether an insurer bears the burden of proving that environmental contamination was "expected" or "intended" by a policyholder, and whether a trial court must instruct a jury concerning the "exceptional circumstances" outlined in *Morton International, Inc. v. General Acci-*

*dent Insurance Co. of America,* 134 *N.J.* 1, 86–87, 629 *A.*2d 831 (1993), *cert. denied,* 512 *U.S.* 1245, 114 *S.Ct.* 2764, 129 *L. Ed.*2d 878 (1994), before allowing the jury to consider whether a policyholder "expected" or "intended" such contamination.

I

Plaintiff Carter–Wallace, Inc. (Carter–Wallace) is a manufacturer of pharmaceutical and consumer products. In 1966, Carter–Wallace hired a licensed waste hauler to remove and dispose of waste generated at the company's Cranbury, New Jersey plant. The waste was transported to the Lone Pine Landfill (Lone Pine) in Monmouth County until 1979, when Lone Pine was closed by the New Jersey Department of Environmental Protection. In 1982, the United States Environmental Protection Agency (EPA) served notice on Carter–Wallace and numerous other parties who had disposed of waste at Lone Pine that they were potentially responsible parties as generators of waste that contaminated the site. Carter–Wallace and many of the other parties then entered into a consent decree with EPA, agreeing to a cleanup of Lone Pine. Subsequently, a number of the parties who generated the waste, including Carter–Wallace, reached agreements among themselves allocating the costs of the cleanup, and the project was completed within the time frame established by EPA.

Carter–Wallace brought this declaratory judgment action in 1989, seeking defense reimbursement and indemnity from over twenty insurers for costs it expended for the cleanup of Lone Pine. The parties did not contest that the estimated amount of those costs was $9.2 million. Carter–Wallace eventually settled with all but one of its insurers, Commercial Union Insurance Company (Commercial Union), which had issued a second-layer excess policy to Carter–Wallace that was in effect from April 30, 1969, to April 30, 1972. That comprehensive general liability (CGL) policy provided $1 million in coverage, which was part of a shared $10 million umbrella coverage in excess of both a primary layer of coverage and a first-level excess layer of coverage. Under Commercial Union's policy, the "proportion of risk insured" is

$1,000,000.00 part of $10,000,000.00 each occurrence and in the aggregate excess of $5,000,000.00 each occurrence and in the aggregate which in turn is in excess of primary insurance.

Thus, Commercial Union's annual $1 million in coverage was in excess of a total of $5.1 million in underlying primary and first-layer excess coverage. In addition, condition J of the policy provides in pertinent part that "[l]iability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence."

The suit against Commercial Union was tried in two phases. Phase I was a jury trial held over several days in April and May, 1994. The court instructed the jury that to avoid liability Commercial Union bore the burden of proving that Carter–Wallace "expected" or "intended" the damage at Lone Pine. Additionally, the court refused to instruct the jury concerning the "exceptional circumstances" criteria outlined in *Morton, supra,* 134 *N.J.* at 86–87, 629 *A.2d* 831. Phase I of the trial culminated in a favorable result for Carter–Wallace. Specifically, the jury found that property damage at Lone Pine occurred during Commercial Union's policy period; that the contamination at Lone Pine was part of a continuous and indivisible process; and that Carter–Wallace neither expected nor intended the environmental damage at Lone Pine. Pursuant to the jury's findings, the court entered an order declaring that the Commercial Union policy provided coverage to Carter–Wallace for costs incurred at Lone Pine.

Phase II of the litigation was a bench trial on the damages issue. Both parties stipulated that the relevant period for assessing the damages issue was the seventeen years from 1966 through 1982. After determining that Carter–Wallace's settlement to clean up Lone Pine was reasonable, the court found that no part of Carter–Wallace's damages was allocable to Commercial Union, reasoning that Carter–Wallace had not yet exhausted all of the primary and first-layer excess coverage in effect during the seventeen-year "trigger period." Interpreting *Owens–Illinois, Inc. v. United Insurance Co.,* 138 *N.J.* 437, 650 *A.2d* 974 (1994), the court determined that the coverage provided by all triggered primary

and first-layer excess policies must be exhausted before allocating any share to Commercial Union's second-layer excess policy. Because Carter–Wallace did not fulfill that requirement of "horizontal exhaustion," the court concluded that Carter–Wallace was not entitled to payment under the Commercial Union policy. The court also determined that although Carter–Wallace was not a "successful claimant" in Phase II of the trial, see *Rule* 4:42–9(a)(6), equitable principles entitled it to fees and costs incurred through December 22, 1994, the date on which this Court decided *Owens–Illinois*.

Both parties appealed to the Appellate Division. In an unreported opinion, the Appellate Division held that the trial court erred in finding that *Owens–Illinois* required exhaustion of the primary and first-layer excess policies in effect during the seventeen-year trigger period before Commercial Union's policy could be pierced. The appellate panel concluded that horizontal exhaustion of all primary and first-layer excess policies was not only not required, but was prohibited under its reading of *Owens–Illinois*. The Appellate Division did not offer an alternative allocation scheme, leaving to the trial court the responsibility of hearing more evidence on the issue on remand. On the remaining issues, the Appellate Division affirmed the trial court's determination that Commercial Union had the burden of proving that the contamination was "expected" or "intended" by Carter–Wallace. It also determined that the trial court properly declined to instruct the jury on the "exceptional circumstances" criteria set forth in *Morton, supra,* 134 *N.J.* at 86–87, 629 *A.*2d 831, when resolving the "expected" or "intended" issue.

We granted certification to consider those issues. 152 *N.J.* 9, 702 *A.*2d 348 (1997).

## II

### A

In *Owens–Illinois, supra,* we first considered whether long-term exposure to an asbestos product "triggered" liability under

CGL policies in effect during the entire period of exposure. We adopted the "continuous trigger" theory of liability, holding that

when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous-trigger theory for activating the insurer's obligation to respond under the policies.

[138 *N.J.* at 478–79, 650 *A.*2d 974.]

Although our endorsement of the continuous trigger theory occurred in the context of asbestos-related personal injury and property damage claims, neither party to this appeal disputes that holding's applicability to progressive environmental property damage. See *id.* at 455, 650 *A.*2d 974 (noting that "[p]roperty-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos"); *Astro Pak Corp. v. Fireman's Fund Ins. Co.*, 284 *N.J.Super.* 491, 499, 665 *A.*2d 1113 (App.Div.)(interpreting *Owens–Illinois* and holding that continuous trigger theory extends to claims for long-term environmental contamination), *certif. denied*, 143 *N.J.* 323, 670 *A.*2d 1065 (1995).

Realizing that the adoption of the continuous trigger theory necessarily meant that multiple insurance policies would bear the responsibility of providing coverage, the question in *Owens–Illinois* then centered on the proper methodology to be used in allocating the appropriate share of that responsibility among each of the triggered policies. We rejected joint-and-several allocation, 138 *N.J.* at 468, 650 *A.*2d 974, a theory under which the problem of indivisible injury is resolved simply by collapsing the continuous injury into one year. Joint-and-several allocation effectively allows a policyholder to simply select one triggered year and exhaust the coverage provided during that period in satisfaction of its claim, *id.* at 459–62, 650 *A.*2d 974, requiring the insurers to sue each other for contribution. We determined that such an approach rested on an assumption not in accordance with the development of the law: "that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same...." *Id.* at 468, 650 *A.*2d 974. We also considered the effect on the

allocation issue of "other insurance" clauses, which are provisions typically designed to preclude a double recovery when multiple, concurrent policies provide coverage for a loss. We determined that such clauses were not generally applicable in the continuous-trigger context where successive rather than concurrent policies were at issue. *Id.* at 470, 650 *A*.2d 974. In sum, we found the contract language and the traditional rules of interpretation to be unhelpful in settling on the proper method of allocating responsibility. *Id.* at 468–71, 650 *A*.2d 974.

Rather, our resolution of the issue was guided by our concern for the efficient use of resources to address the problem of environmental disease and by the demands of simple justice. *Id.* at 472–73, 650 *A*.2d 974. We also observed that "[b]ecause insurance companies can spread costs throughout an industry and thus achieve cost efficiency, the law should, at a minimum, not provide disincentives to parties to acquire insurance when available to cover the risks." *Ibid.* We determined that "any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure," and concluded that the "better formula" was to "allocate[ ] the losses among the carriers on the basis of the extent of the risk assumed, *i.e.*, proration on the basis of policy limits, multiplied by years of coverage." *Id.* at 475, 650 *A*.2d 974 (citing *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 26 *Cal.Rptr*.2d 35, 57 (1993)).

We provided an illustration to explain what we meant by an allocation scheme that was related both to the years of coverage and the degree of risk assumed. During a nine-year period, our model assumed that in years one through three coverage for the owners of an office building was provided in the amount of two million dollars per year; in years four through six the applicable coverage had a limit of three million dollars per year; and in years seven through nine, during which time no insurance was purchased, the self-insured risk was four million dollars per year. *Id.* at 475–76, 650 *A*.2d 974. Thus, under an allocation methodology that is proportionate to the degree of the risks transferred or

retained during the years of exposure, insurers in years one through three would bear 6/27ths of the responsibility, insurers in years four through six would shoulder 9/27ths, and the building owners in years seven through nine would be responsible for 12/27ths. *Id.* at 476, 650 *A.2d* 974.

Nevertheless, we expressly declined to address how the solution we crafted would affect excess insurers:

> We realize that many complexities encumber the solution that we suggest involving, as it does, proration by time and degree of risk assumed—for example, determining how primary and excess coverage is to be taken into account or the order in which policies are triggered. The parties did not focus on those issues. [*Ibid.* (citations omitted).]

At issue in this appeal is how excess insurance is to be considered when allocating responsibility under a continuous trigger of liability.

### B

Commercial Union first argues that the plain language of condition J of its policy requires that all primary and first-layer excess policies in effect throughout the seventeen-year trigger period be exhausted before its policy may be allocated. As noted, that policy condition provides that "[l]iability under this policy with respect to any occurrence shall not attach unless and until the insured, or the insured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence." According to Commercial Union, the *Owens–Illinois* discussion of "other insurance" clauses occurred only in the context of rejecting the joint-and-several allocation methodology, and does not encompass exhaustion provisions such as condition J. Because exhaustion provisions are designed not to allocate loss among concurrent policies but are part "of the insurer's definition of the amount of risk it is willing to accept," Commercial Union asserts that condition J differs in purpose from "other insurance" clauses.

Commercial Union also proposes an allocation method that it contends is consistent with *Owens–Illinois* and with the plain meaning of condition J:

> The Commercial Union method begins by adding together the per occurrence limits of the primary policies in the coverage block. Then, the sum of each primary insurer's limits are divided by the sum of the total triggered primary limits, to determine the percentage of loss assigned to that insurer for that level. That percentage is multiplied by the total limits per level to determine the amount the insurer must pay. If additional loss remains to be allocated after each primary insurer has paid its policy limits, this process is repeated on each excess layer until the loss is fully allocated.

Essentially, Commercial Union's method of horizontal exhaustion by layer subordinates its coverage responsibility to all primary and first-level excess policies in effect during the entire seventeen-year trigger period. Under the circumstances of this case, that methodology results in Commercial Union indemnifying no portion of Carter–Wallace's costs.

Carter–Wallace submits a different proposal that rejects the horizontal exhaustion of primary policies. Under its allocation method, Carter–Wallace is entitled to indemnification in the amount of $72,350 from Commercial Union. It describes the appropriate allocation method thusly:

> The limits of the Commercial Union Policy are 10% of $10 million, excess of $5.1 million underlying cover[age] for each year of its 3–year policy period. In other words, Commercial Union is responsible for 10% of the cost above $5.1 million, up to a maximum liability of $1 million, for 3 of the 17 triggered years. Carter–Wallace's total covered costs at the time of the Phase II trial were $9.2 million. The Commercial Union Policy covers 10% of $4.1 million ($9.2 million coverage—$5.1 million in underlying coverage) or $410,000. As the Commercial Union Policy covers 3 of the 17 policy years in this $410,000 triggered layer, its share of the loss is $72,350 [$410,000 divided by 17, multiplied by 3]. . . .

■ We view the allocation methods proposed by both parties as untenable and inconsistent with the principles we set forth in *Owens–Illinois*. Were we to adopt Commercial Union's allocation method, its coverage obligation would be subordinated not just to the primary and first-level excess policies in effect during the time of its coverage, but to all primary and first-level policies in effect throughout the entire seventeen-year trigger period. In support of that position, Commercial Union relies on its policy language that requires the underlying limits of coverage to be exhausted before liability attaches under its second-level excess policy. Fairly read, that provision requires the vertical depletion of the

relevant policies in effect during the time of the excess policy's coverage; we are unpersuaded that the clause somehow applies to future policies that had not been written or signed at the time this second-layer excess policy was issued. Moreover, we note the similarity between this exhaustion provision and the "other insurance" clauses we found to be inapplicable in the context of a continuous trigger. *Owens–Illinois, supra,* 138 *N.J.* at 470, 479, 650 *A.*2d 974. Therefore, as in *Owens–Illinois, id.* at 468, 650 *A.*2d 974, "[w]e are unable to find the answer to allocation in the language of the polic[y]."

■ Carter–Wallace's approach is similarly inadequate. Its proposed solution is premised on the assumption that an excess-layer policy can be allocated if the entire loss sustained during a continuous-trigger period is treated as if it occurred in only one year. In other words, by using the figure $4.1 million (the amount of damages above the underlying $5.1 million in coverage) to calculate Commercial Union's share of responsibility, Carter–Wallace's allocation method simply collapses the damages incurred over the entire seventeen-year trigger into Commercial Union's policy period. That technique most closely resembles the joint-and-several allocation method that we specifically rejected in favor of a *pro rata* method that accounted for the time on the risk and the degree of risk assumed. *Id.* at 479, 650 *A.*2d 974.

■ We therefore reject each alternative advanced by the parties to this appeal. Instead, we are confident that another allocation method more faithful to the principles articulated in *Owens–Illinois* is available to resolve this issue. In *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co.,* 978 *F.Supp.* 589 (D.N.J.1997), Judge Brotman relied on *Owens–Illinois* in allocating coverage between various levels of excess insurance. Not unlike this appeal, *Chemical Leaman* involved a plaintiff that sought coverage for costs incurred as a result of environmental contamination. *Id.* at 592–93. The insurers argued that each layer of insurance must be exhausted across all of the triggered policy years before the next layer would be allocated, *id.* at 604, a

contention that Commercial Union echoes here. Using the example we provided in *Owens–Illinois*, the court observed that "[t]he *Owens–Illinois* method intentionally assigns a greater portion of indemnity costs to years in which greater amounts of insurance were purchased, based on the view that this measure of allocation is more consistent with the economic realities of risk retention and risk transfer." *Id.* at 605. The court therefore rejected the theory of horizontal exhaustion by layer, and "direct[ed] apportionment of damages among policy years without reference to the layering of policies in the triggered years." *Ibid.* However, the court did note that within any given year, each layer of excess coverage must be depleted before the next level is pierced. *Id.* at 606.

In order to allocate fairly the losses among carriers to the extent of the risk assumed by each, we provided an illustration in *Owens–Illinois, supra,* that assumed a nine-year continuous trigger and broke down the corresponding obligations of the insurers and the owners into three three-year periods. 138 *N.J.* at 475–76, 650 *A.*2d 974. Based on the amount of coverage provided in each three-year block, we determined that carriers in the first three years would bear 6/27ths of the burden, carriers in the second three years 9/27ths, and the building owners in the last three years would bear 12/27ths of the loss (a time in which no insurance had been purchased). In *Chemical Leaman,* the court simply extended that calculation to make the further assessment of the responsibility borne by each *year* of the continuous trigger. 978 *F.Supp.* at 605. Returning to our example, carriers in the first year would therefore be responsible for 2/27ths of the loss, carriers in the second year for 2/27ths, and carriers in the third year for 2/27ths. Then, having reached a figure for each year, the *Chemical Leaman* court adopted a method that vertically allocated each policy in effect for that year, beginning with the primary policy and proceeding upward through each succeeding excess layer. *Id.* at 606. Assume that primary coverage for one year was $100,000, first-level excess insurance totaled $200,000, and second-level excess coverage was $450,000. If the loss allocated to

that specific year was $325,000, the primary insurer would pay $100,000, the first-level excess policy would be responsible for $200,000, and the second-level excess policy would pay $25,000.

We believe Judge Brotman's well-reasoned opinion in *Chemical Leaman* represents a natural extension of *Owens–Illinois*, one that is entirely consistent with our belief that "any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure." *Owens–Illinois, supra*, 138 *N.J.* at 475, 650 *A.*2d 974. In *Owens–Illinois* we identified several public interest factors relevant to the appropriate method of allocating insurance coverage, including the efficient use of available resources, the interests of simple justice, and the need for an "efficient response" to the logistical challenge posed by environmental insurance litigation. *Id.* at 472–74, 650 *A.*2d 974.

We are confident that the *Chemical Leaman* solution best serves those interests. Firstly, this approach makes efficient use of available resources because it neither minimizes nor maximizes the liability of either primary or excess insurance, thereby promoting cost efficiency by spreading costs. See *Owens–Illinois, supra*, 138 *N.J.* at 472–73, 650 *A.*2d 974. That method also promotes "simple justice," *id.* at 473, 650 *A.*2d 974, by respecting the distinction between primary and excess insurance while not permitting excess insurers unfairly to avoid coverage in long-term, continuous-trigger cases. Additionally, adoption of that allocation method will introduce a degree of certainty and predictability into the complex world of environmental insurance litigation in continuous-trigger cases. Moreover, we perceive that that solution is consistent with the contract language, as Commercial Union's second-level excess policy will not be pierced unless and until the primary and first-level excess policies in effect for a given year have been expended.

Our jurisprudence in this area has not been marked by rigid mathematical formulas, and we do not advocate any such inflexibility now. Rather, our focus remains on "[a] fair method of

allocation ... that is related to both the time on the risk and the degree of risk assumed." *Id.* at 479, 650 *A.*2d 974. Nevertheless, we anticipate that the principles of *Owens–Illinois,* as clarified by our decision today, represent the presumptive rule for resolving the allocation issue among primary and excess insurers in continuous trigger liability cases unless exceptional circumstances dictate application of a different standard. *See* Comment, *Allocating Progressive Injury Liability Among Successive Insurance Policies,* 64 *U. Chi. L.Rev.* 257, 259 (1997)(noting that "[t]he magnitude of the losses in [progressive injury] cases further illustrates the need for courts to choose one method, and apply it consistently, when allocating liability for progressive injuries").

## III

The remaining issues raised by this appeal relate to the trial court's instructions to the Phase I jury. Commercial Union asserts that the trial court improperly assigned it the burden of proving that Carter–Wallace expected or intended the environmental damage at Lone Pine. Additionally, Commercial Union contends that it was error for the trial court not to charge the jury on the "exceptional circumstances" set forth in *Morton, supra,* 134 *N.J.* at 86–87, 629 *A.*2d 831.

## A

■ Commercial Union's policy provided coverage for an "occurrence," defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which *unexpectedly and unintentionally* results in personal injury, property damage or advertising liability during the policy period." (Emphasis added). The court instructed the jury that although Carter–Wallace had to show by a preponderance of the evidence that its claim against Commercial Union was within the coverage afforded by the policy, Commercial Union bore the burden of proving that Carter–Wallace expected or intended the contamination at Lone Pine:

[T]he defendant contends that there were exclusions from coverage, that the damage was either expected or intended. In that respect, the defendant has the burden of proving that the plaintiff expected or intended the damages. And by the same standard, by a fair preponderance of the credible evidence....

....

If Commercial Union proves that Carter–Wallace actually expected or intended that its waste would cause groundwater contamination at Lone Pine, then the Commercial Union policy would not provide coverage to Carter–Wallace for its cleanup liability.

Commercial Union does not dispute the general rule that an insurer bears the burden of proving that a policy exclusion precludes coverage. See *Princeton Ins. Co. v. Chunmuang*, 151 *N.J.* 80, 95, 698 *A*.2d 9 (1997)(noting that "the burden is on the insurer to bring the case within the exclusion")(citing *Burd v. Sussex Mut. Ins. Co.*, 56 *N.J.* 383, 399, 267 *A*.2d 7 (1970)). Rather, it asserts that the "unexpectedly and unintentionally" language does not constitute an exclusion but merely is a component of the definition of an "occurrence." Therefore, as part and parcel of the basic grant of coverage, Carter–Wallace would have the burden of showing that it neither expected nor intended the contamination at Lone Pine in order to secure indemnity from Commercial Union. *See, e.g., Adron, Inc. v. Home Ins. Co.*, 292 *N.J.Super.* 463, 473, 679 *A*.2d 160 (App.Div.1996)(finding that "[t]he burden was initially on plaintiff to bring the claim within the basic terms of the policy"); 21 John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 12094, at 24 (rev. ed.1980)(noting that "[o]ne suing on a liability policy must establish that the loss fell within its terms")(footnote omitted).

The proper assessment of Commercial Union's claim of error must be made in the context of our holding in *Morton, supra*, 134 *N.J.* 1, 629 *A*.2d 831. In that case, we determined that the standard pollution-exclusion clause contained in CGL policies would be enforced only to the extent that it precluded coverage for an insured's intentional discharge of a known pollutant, regardless of whether the resulting property damage was intended or expected. *Id.* at 78, 629 *A*.2d 831. However, we also addressed whether the events culminating in property damage constituted an "occur-

rence" under policies that did not contain pollution-exclusion clauses. *Id.* at 80, 629 *A.*2d 831. Resolution of that issue necessarily required an assessment of whether the insured intended or expected the ultimate injury. We recognized the unique nature of environmental-pollution cases, and the difficulty of uncovering "the insured's subjective intent to determine intent to injure." *Id.* at 85, 629 *A.*2d 831 (quoting *Voorhees v. Preferred Mut. Ins. Co.,* 128 *N.J.* 165, 185, 607 *A.*2d 1255 (1992)). Despite that difficulty, we also rejected as unjustified a rule that would presume an intent to injure based simply on a knowing discharge of pollutants. *Id.* at 86, 629 *A.*2d 831. Rather, we concluded that a case-by-case analysis would be necessary to determine whether "exceptional circumstances [exist] that objectively establish the insured's intent to injure." *Ibid.* (quoting *Voorhees, supra,* 128 *N.J.* at 185, 607 *A.*2d 1255).

> Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
> [*Id.* at 86–87, 629 *A.*2d 831.]

We then detailed the extensive evidence establishing that the insured's predecessors intended or expected the resulting environmental injury, and concluded that summary judgment was properly awarded to the insurers. *Id.* at 91–95, 629 *A.*2d 831.

 Our experience in *Morton* leads us to conclude that an insurer must bear the burden of proving that an insured intended or expected environmental damage. As we noted in *Morton,* "[a]bsent 'smoking gun' testimony from a disgruntled employee, proof of subjective intent to cause environmental harm will rarely be available in coverage litigation." *Id.* at 85–86, 629 *A.*2d 831. Accordingly, requiring an insured to prove a negative fact—that it did not intend or expect environmental damage—in this context would in our view be highly impractical; the insured's incentive consists of little more than a motivation to present general testimony that it had no expectation that its activities would result in property damage. In another context, we have emphasized our

inherent reluctance to place the burden of proving a negative fact on a litigant. *See Barbato v. Alsan Masonry & Concrete, Inc.*, 64 *N.J.* 514, 532, 318 *A.*2d 1 (1974)(observing in workers' compensation case that "[i]f the claimant had the burden of proof to establish that her employment in a position commensurate with her now lessened abilities was implausible, she would have the burden of proving a negative fact . . ."); *see also U.S. v. Rosero*, 42 *F.*3d 166, 171 (3d Cir.1994)(noting "the difficulties often associated with proving a negative"); *Williams v. Topps Appliance City*, 239 *N.J.Super.* 528, 532–33, 571 *A.*2d 1311 (App.Div.1989)(noting in workers' compensation case that burden of establishing negative is "something the law rarely, if ever, imposes"). Rather, it is the insurer who has an interest in, and is better positioned for, eliciting facts on the basis of which a trier of fact can conclude that the insured expected or intended environmental contamination. We therefore conclude that the "unexpectedly and unintentionally" language of the occurrence definition should be treated as an exclusion for purposes of assigning the burden of proof in environmental coverage cases.

 Moreover, we emphasize that whether inserted in the form of a specific exclusion or packaged within the definition of an "occurrence," the effect of this language is ultimately the same: it denies coverage for damage expected or intended from the standpoint of the insured. See *Clemco Indus. v. Commercial Union Ins. Co.*, 665 *F.Supp.* 816, 820 (N.D.Cal.1987)(concluding that placement of "neither expected nor intended" language in definition of coverage "in no way changed the effect or character of the phrase . . . [it] remained an exclusion of the coverage grant by the very operation of its terms"), *aff'd* 848 *F.*2d 1242 (9th Cir.1988); *see also Andover Newton Theological School, Inc. v. Continental Cas. Co.*, 964 *F.*2d 1237 (1st Cir.1992)(noting "[i]f an insurer were able to distribute provisions limiting liability throughout a policy, with the expectation that its shouldering of the burden of proof would be limited to the single section entitled, 'Exclusions,' this would create considerable incentive to obfuscation and subter-

fuge"). We agree that exclusions do not shed their essential character when they are moved from one section of a policy and are crafted as part of that policy's grant of coverage. We therefore decline to adopt a rule of law governing burden of proof the application of which would depend merely on the location of a provision in an insurance contract.

Our recognition that the "unexpectedly and unintentionally" language constitutes a policy exclusion for purposes of assigning the burden of proof is consistent with case law. *See Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 842 *F.Supp.* 125, 129 (D.N.J.1993)(citing *Morton* and rejecting insurer's motion for summary judgment on basis of "neither expected nor intended" language of "occurrence" definition, noting that the insurer "must demonstrate with support from the record that [the insured] 'expected/intended' to cause the environmental damage"); *Continental Ins. Co. v. Beecham, Inc.*, 836 *F.Supp.* 1027, 1042 (D.N.J.1993)(noting that because insurer alleged no occurrence took place, it "will bear the burden of proving that the ultimate damage was expected or intended"); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 750 *F.Supp.* 1340, 1350 (E.D.Mich.1990)(assigning burden of proof regarding "neither expected nor intended" clause in definition of occurrence to insurer, noting that "[t]his interpretation is supported by case law and the general rule ... that an insurer must prove the applicability of an exclusion to coverage"); *Summit Assocs., Inc. v. Liberty Mut. Fire Ins. Co.*, 229 *N.J.Super.* 56, 62–63, 550 *A.*2d 1235 (App.Div.1988)(observing that "[i]n order to succeed with its claim that this was not an occurrence, [the insurer] needed to establish that [the insured] knew or should have known of the likelihood that construction on its premises would result in the release of contaminants"); *see also Voorhees, supra*, 128 *N.J.* at 183–84, 607 *A.*2d 1255 (finding that in context of homeowner's policy, accidental nature of occurrence is determined by whether injury was intended or expected, and that relevant inquiry is the same as that for intentional-acts exclusions). *But see, e.g., Pittston Co. v. Allianz Ins. Co.*, 905 *F.Supp.* 1279, 1300–01 (D.N.J.1995)(placing expected/intended

burden of proof on insured because occurrence is element of coverage), *rev'd in part*, 124 *F*.3d 508 (3d Cir.1997); *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 *F.Supp.* 1136, 1143–45 (D.N.J.1993)(same), *aff'd in part*, 89 *F*.3d 976 (3d Cir.), *cert. denied*, —— *U.S.* ——, 117 *S.Ct.* 485, 136 *L. Ed.*2d 379 (1996).

Moreover, we perceive that in most complex environmental-contamination cases, the burden-of-proof issue will be of limited importance. Most likely, facts supporting or negating an "expected/intended" finding will be elicited during discovery and will illuminate the issue for a trier of fact. We anticipate that the rare case will be one in which the ultimate resolution of this issue depends on which party bears the burden of proof.

## B

 Commercial Union's proposed jury instruction for the Phase I trial informed the jury that it could consider the "exceptional circumstances" outlined in *Morton, supra,* 134 *N.J.* at 86–87, 629 *A.*2d 831, when considering whether Carter–Wallace expected or intended the property damage at Lone Pine. As noted previously, those *Morton* circumstances include

the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.

[*Ibid.*]

The adoption of the "exceptional circumstances" standard in *Morton* was our response to the tension between the difficult task of uncovering an insured's subjective intent in complex environmental cases and the unfair solution of presuming an intent to injure simply on the basis of a knowing discharge of pollutants. *Id.* at 85–86, 629 *A.*2d 831.

The trial court in this case declined to instruct the jury to consider those five *Morton* factors. The Appellate Division upheld this determination, noting that "the evidence here simply does not

reach the level in *Morton.*" The trial court did, however, provide the jury with an extensive instruction regarding the issue whether Carter–Wallace expected or intended to cause environmental contamination:

Now if you find that the groundwater [damage] at Lone Pine landfill occurred during the policy period, then you must go into the expected or intended exclusion. Property damage is accidental and, therefore, covered by the Commercial Union policy if that damage was not expected, it was not intended from the standpoint of Carter–Wallace. Thus, it doesn't matter whether Carter–Wallace expected or intended to have its waste exposed [sic] at the Lone Pine landfill, only if Carter–Wallace actually expected or actually intended to cause groundwater contamination at Lone Pine of the kind and quality that in fact occurred, will the insurance coverage be denied.

If Commercial Union proves that Carter–Wallace actually expected or intended that its waste would cause groundwater contamination at Lone Pine, then the Commercial Union policy would not provide coverage to Carter–Wallace for its cleanup liability.

As to the intended exclusion, you must consider whether or not Carter–Wallace actually wanted to cause that contamination of that site. As to the expected exclusion, you must determine whether Carter–Wallace knew with some substantial certainty that its actions would cause or were causing that damage. And the proof must be that Carter–Wallace subjectively expected or intended to cause the groundwater contamination of the kind and quality that occurred.

In determining whether Carter–Wallace subjectively expected or intended the property damage in question [it] is not enough for you to find that Carter–Wallace should have expected that damage would occur, nor is it for you to find that other people of other companies in similar circumstances might have expected the damage to occur. Rather, you're instructed to determine whether or not Carter–Wallace actually expected or actually intended to cause the contamination.

Even if you believe that Carter–Wallace['s] actions were negligent or reckless, Carter–Wallace is still entitled to coverage unless you find that it expected it or intended to cause the damage at the Lone Pine landfill.

In making this determination, you must judge Carter–Wallace by what you find it actually knew and understood during the periods of '69 to—1969 to 1972; you should not judge Carter–Wallace['s] expectations or intentions by today's standards, some 25 years later. You should judge Carter–Wallace's expectations or intentions according to what was known at the—by them at the time.

*Now you heard me tell you about circumstantial evidence a few moments ago, what it is. The defendant, in attempting to prove whether Carter–Wallace expected or intended the damage, is entitled to have you consider not only the direct testimony but any circumstantial evidence as to whether or not it was able to prove that Carter–Wallace expected or intended the damage in question.*

Now since Carter–Wallace is a corporation, the expectation or intent of the corporation can only be measured by the knowledge and expectation of its

employees. Therefore, in determining whether Carter–Wallace expected or intended to cause groundwater contamination at the Lone Pine landfill, you must determine whether its corporate management, that is those persons responsible for formulating ... its waste disposal policies or its employees with functional responsibility for waste disposal procedures, expected or intended that damage.
[Emphasis added.]

Commercial Union argues that the trial court's failure to instruct on the *Morton* factors precluded the jury from making a proper analysis of the question whether Carter–Wallace expected or intended the contamination at Lone Pine.

Assuming that there was sufficient evidence in the record to permit a jury to conclude that Carter–Wallace intended or expected environmental damage to occur, the jury should have been informed of the *Morton* factors in order to assist it in assessing Carter–Wallace's state of mind. Although omitting any reference to some of those factors, we find that the court's instruction in this case adequately conveyed to the jury the appropriate legal standard for resolving the issue. The court's charge properly focused the jury's attention on what Carter–Wallace knew or expected during the time Commercial Union's policy was in effect, a time when the waste was being generated and disposed of. More important, the charge emphasized to the jury that it could consider any circumstantial evidence presented, an instruction that effectively would have led the jury to consider, among other factors, "the existence of subjective knowledge concerning the possibility or likelihood of harm." *Id.* at 86–87, 629 *A.*2d 831. Further, the instruction directed the jury to assess the knowledge and expectations of Carter–Wallace's employees, thereby appropriately focusing the inquiry on "the quality of the insured's knowledge." *Id.* at 86, 629 *A.*2d 831. Additionally, we note that Commercial Union's counsel argued during summation the presence of exceptional circumstances—including Carter–Wallace's appreciation of the hazards associated with some of its waste and knowledge that the waste was causing harm at Lone Pine—thus presenting the relevant inquiry squarely before the jury.

Moreover, any deficiencies in the trial court's instructions must be viewed within the context of the record before this jury, in

contrast with the egregious behavior we detailed in *Morton*. In *Morton*, the owners of a mercury-processing plant failed to honor promises to remediate the quality of its emissions into nearby creeks, continued to intentionally discharge pollutants for years after the unacceptable quality of those contaminants was brought to their attention, ignored demands for compliance from government officials and state engineers, and ignored reports from their own consultants regarding the unacceptability of their discharges into a nearby creek. *Id.* at 88–93, 629 *A.*2d 831.

In contrast, the record here reveals that rather than indiscriminately dumping contaminants onto nearby land as occurred in *Morton*, Carter–Wallace procured a duly-licensed waste hauler to dispose of its waste. Moreover, the record suggests that the waste generated by Carter–Wallace consisted primarily of common trash; although some hazardous materials were also disposed of, including residual chemical components of manufactured products as well as cleaning solvents, such materials were not present in substantial concentrations. Expert testimony was also presented suggesting that Carter–Wallace observed accepted methods of waste disposal in place at the time. Additionally, no evidence adduced at trial suggested that Carter–Wallace received or ignored governmental warnings concerning its waste-disposal practices. See *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 *F.*3d 976, 989–90 (3d Cir.) (suggesting importance of party's "stonewalling" in assessment whether *Morton*'s exceptional circumstances exist), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 485, 136 *L. Ed.*2d 379 (1996).

In sum, we consider any shortcoming in the court's charge to be harmless in view of the instructions provided by the trial court, combined with the minimal evidence presented by this record suggesting knowledge or expectation of environmental harm.

## IV

As modified, the judgment of the Appellate Division is affirmed. On remand the trial court will conduct proceedings consistent with this opinion.

*For affirmance as modified*—Chief Justice PORITZ, and Justices HANDLER, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.